ST. PAUL MERCURY INDEMNITY COMPANY v. LOWELL E. GUNTZBURGER AND OTHERS.[1]

February 19, 1937.

No. 31,183.

[1]Reported in 271 N. W. 478.

290

*Thomas H. Quinn,* for appellant.
*Smith & Coughlin,* for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiff prevailed in its action to recover upon a promissory note. The only answering defendant is appellant, August Guntzburger (so we shall hereafter refer to him alone as defendant), who appeals from an order denying his motion for new trial after the court had instructed the jury to return a verdict against him.

Plaintiff is a corporation engaged in the business of underwriting, as surety, fidelity contracts of persons holding positions of trust, particularly for those who by virtue of their employment have the handling of funds for their employers. As such it had underwritten a bond of indemnity for defendant Lowell E. Guntzburger, a collector of funds for W. H. Barber Company. The latter had embezzled $857.49 of his employer's money. The surety was promptly notified of the default and Lowell discharged from service. Defendant Muriel is the wife of Lowell, and August is his grandfather. Lowell's wrongdoing is the foundation for the present conflict, the note upon which this action was brought being the instrument procured in the supposed adjustment reached by the Barber company and the Guntzburgers. The note includes the embezzled money and also some $400 which the company had advanced to Lowell.

The complaint is in the usual form employed where a promissory note is the cause of action. Defendant admitted the execution of the note but averred in avoidance that his signature thereto was procured by means of threats and duress; that Lowell (whose obligation alone the note represents) was threatened with criminal prosecution by the payee, the Barber company; that such threats were made by an agent for the company who thereby coerced defendant and wrongfully prevailed upon him to join in its execution. When both parties rested plaintiff moved the court for a directed

verdict upon the ground that defendant had failed to make out the defense pleaded. The court granted the motion.

Of course upon defendant rested the burden of making his defense. The only question we need consider is whether the evidence tendered by defendant was such as to permit a jury to find for him. The record, viewed in the light most favorable to defendant, would permit finding the following facts: Defendant thought very highly of and was attached to his grandson, the latter's wife, and their two young children. He knew nothing about anything being wrong with regard to Lowell's conduct. The day before the signing of the note the grandson went to Faribault, where the grandfather lived, inviting him to come to St. Paul for a visit, promising he would see to it that the grandfather was promptly taken back after he had visited at his home. After some urging the old gentleman went, the grandson furnishing the transportation in his automobile. All the following day the old gentleman was at the home of his grandson visiting. But he noted from Muriel's conduct and hints that all was not well; there was something radically wrong. She would not tell the old man just what the trouble was, but that it had a disturbing effect upon his mind is quite evident to anyone reading the record. At any rate, when the grandson came home that evening and after they had partaken of the evening meal the facts were brought out. Lowell told the old gentleman that he was in trouble with his employer because he had collected considerable sums of money which he had appropriated to his own use. He expressed grave fear of the consequences if the matter were not taken care of. The old gentleman said he had no money with which to finance his grandson's liabilities, but the latter suggested that he had conferred with an agent of the company and that a promise had been made that if a note were given for the amount involved and a satisfactory signer obtained the whole thing could be thus settled and the entire deal closed in a wholly satisfactory way. The situation thus disclosed left upon the old man's mind a compelling impression that some such adjustment was necessary if prosecution for embezzlement were to be avoided. About eight o'clock that eve-

ning Mr. Hawkland, an agent for the employer, appeared at Lowell's home. There for a period of about two hours the difficulty Lowell was in was discussed most thoroughly. Perhaps from this point it is well to let the old man tell his own story:

"And he [Hawkland] handed me the note and I refused to sign. And finally says I, 'Now, what you going to do if I don't sign that note?' 'Well,' he says, 'we will turn him over to the bonding company, and you know what that means.' Says I, 'Yes, I think that means state's prison.' And he said 'Yes.' Well, my grandson sat right there and [I] looked in his eye. I could see him. He faced me. Mr. Hawkland was sitting right about this way from me. And I see the tears was running down his [Lowell's] cheeks, and that is what got me, and I signed it. I didn't want my name dragged in that I have a grandson in the state's prison.

Q. "And you had been talking about this matter, as you say, all through the evening, the couple hours that he was there?

A. "Yes, more or less.

Q. "Now, if this had not been said to you, would you have signed that note otherwise, Mr. Guntzburger? * * *

A. "I don't think I would.

Q. "Is that why you signed this note?

A. "That is why I signed the note.

Q. "And did you believe that if you did not sign it your grandson would be turned over to the bonding company and prosecuted and sent to prison?

A. "I sure did believe it, that is what they would do, and I was thinking of the two children he has got and his wife."

And on cross-examination:

Q. "The thing that finally induced you to sign the note was that you saw tears in your grandson's eyes?

A. "I think that is what got me.

Q. "You think that is what got you?

A. "Yes, sir. And another thing, I never had any lawsuit or anything of that kind; I never had anybody of my family sent to the state's prison, and I hated to see him go.

Q. "You were afraid he would go because—

A. "Well, he naturally would, if they turned him over to the bonding company. That was my idea. * * *

Q. "Now, you stayed there until the next day, did you?

A. "Yes, of course, it was dark. It was, as I say, it must have been around ten o'clock when he left.

Q. "And you went down to the Barber company and saw the note again?

A. "Yes, sir.

Q. "What did you go over there for?

A. "Well, I don't just exactly recollect why I did go, but I think it was he [Hawkland] was going to look through the books and see whether there is anything else turned up. I think that is what it was. He knows more about that. But I went down to the office. They came up to the house and got me and brought me back home again from the office. They got me from the house to the office, and he sent a man back again when I was through. But I wasn't there very long anyway."

Defendant's testimony is adequately corroborated. The note was made in March, 1934, the trial had in May, 1936. Defendant was then past 82 years of age. He was a retired farmer of limited means. His farm of 138 acres was bringing him scanty income. He had no money laid by. He was long past the age when any earning capacity remains. The note is for $1,260.48 and interest since the making. It came into plaintiff's hands after maturity, so there is no question of defendant's right to defend upon the ground pleaded. The sole issue is whether the facts stated were sufficient to take the case to the jury.

Duress is a species of fraud. Like fraud and undue influence, it is not easily defined. "The only difference between fraud, undue influence, and duress is in the means employed to overcome the will." Compulsion in some form is the means employed. The ultimate question always is "the genuineness of the contractual consent." Was the defendant "subjected to a pressure which overcame his will and coerced him to comply with demands to which

he would not have yielded if he had been acting as a free agent?" Our cases hold that duress may be effected by implied as well as direct threats, and this includes an implied threat of prosecution. Quinn v. U. S. F. & G. Co. 163 Minn. 320, 204 N. W. 156; 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 2848, and the cases cited under notes. This court in American Nat. Bank v. Helling, 161 Minn. 504, 202 N. W. 20, lucidly illustrates what means, of a nature similar to what we have before us, constitutes duress. That case, we think, sustains defendant's position. Bearing in mind the situation confronting him when this note was executed, the presence of the agent for Lowell's employer, who had been in direct charge of Lowell's work and was his superior in service; the surrounding circumstances hereinbefore related; the implication and threat of prosecution of one who was near and dear to him; the effect of and the undeniable blemish such prosecution would have upon the family name—all these must be taken into consideration in determining and deciding whether the old man's will was overcome to the extent that he was no longer acting as a free agent.

It may be conceded that the case is close to the border line, but that does not deprive the defendant of the right to have a jury pass upon his claims. Admittedly he owed nothing to the grandson's employer. No obligation of any kind rested upon him. Under these circumstances, can we say as a matter of law that his will was not overcome by the agent representing the employer? If the note had been executed under similar circumstances and fraud alone were involved, can we say as a matter of law that a *prima facie* case was not made for defendant? We think not.

Perhaps the most difficult hurdle for defendant to meet is that on the next day he went to the office of the company. It may well be argued that he had then slept upon the situation and had had sufficient time to consider the importance of the act of the prior evening. That question, however, is not one which in our opinion destroys what happened when the note was signed. Perhaps the question of waiver enters into the case. If so, that presents a fact issue.

Defendant had consulted no lawyer, in fact no one except the grandson and the latter's wife. Obviously, because of Lowell's predicament, they were not the best source from which to get the desired help which the old man obviously needed.

We think the issue made presented a jury question and that the court erred in directing a verdict.

Order reversed.

MR. JUSTICE STONE took no part in the consideration or decision of this case.