DALLAVO *v.* DALLAVO.

1. CANCELLATION OF INSTRUMENTS—DURESS—HUSBAND AND WIFE—DIVORCE.

In a suit to cancel certain conveyances and deeds between complainant and his wife in settlement of their marital affairs, and to induce defendant to consent to let a decree of divorce stand between the parties which she claimed had been procured by his fraudulent representations concerning her place of residence, evidence of a conflicting nature considered, and *held*, to warrant the conclusion of the trial court that the complainant failed to establish his claim of duress under threats of prosecution.

2. SAME.

    The fact that complainant weighed in his mind what consequences might result from his failure to enter into a settlement, unless actual threats of prosecution were made by the wife, did not establish that he was so bereft of the quality of mind and power of will essential to entering into contracts as to be incapacitated to exercise freedom of will power.

3. SAME—EQUITY—CLEAN HANDS.

    That complainant was not innocent of wrong doing was not a ground for denying to him equitable relief under the maxim that he who comes into a court of equity must come with clean hands.

4. SAME—MARRIAGE SETTLEMENT—CONTRACTS—CONSIDERATION.

    The fact that the wife agreed in the contract to care for and support the minor children of complainant was sufficient consideration to support the agreement.

5. SAME—HUSBAND AND WIFE—DOWER.

    But *held*, that the dower interest of complainant's second wife should be preserved and the court of equity should retain jurisdiction for that purpose and an order dismissing the bill of complaint is reversed.

Appeal from Kent; McDonald, J. Submitted October 22, 1915. (Docket No. 153.) Decided December 21, 1915.

Bill by John Dallavo and wife against Henrietta Dallavo and another to set aside a contract and certain instruments of conveyance. From a decree dismissing the bill, complainants appeal. Modified and affirmed.

*Smedley & Linsey,* for complainants.

*L. C. Palmer* and *Clapperton, Owen & Hatten,* for defendants.

KUHN, J. The bill of complaint in this cause alleges duress, fraud, and want of consideration as grounds for setting aside certain instruments, to wit, a deed executed by the complainants on the 17th of August,

1912, to the defendant Henrietta Dallavo, conveying the fee in certain property hereinafter called the "Finch property;" a certain contract entered into between John Dallavo and Henrietta Dallavo on the same day concerning the same property; a certain life lease from Henrietta Dallavo to John Dallavo covering a part of said property; a certain mortgage executed at the same time covering an 80-acre farm located in Home township, Montcalm county; and also two promissory notes amounting to $225, executed by John Dallavo and payable to the defendant Palmer.

The decree of the court dismissed the bill of complaint, but held that, as to the complainant Marie Dallavo, her deed to the land in question was without legal consideration, and the conveyance to Henrietta Dallavo was confirmed, subject, however, to the dower rights of said Marie Dallavo therein, and the life lease to John Dallavo. From this decree the complainants have appealed.

The complainant John Dallavo, who was an Austrian by birth, was married in 1880 to the defendant Henrietta Dallavo in Germany. While serving a prison sentence in Germany for subornation of perjury he escaped, and found his way to this country about 1886, and settled near Howard City in this State, where he was joined later by his wife and three children. He engaged in the lumber business, and carried on a general business in connection therewith, and through the joint efforts of himself and his wife, who in addition to her family cares and duties, boarded the men employed, took principal charge of the business affairs, kept the books of account, did the buying and selling, etc., they accumulated about $50,000 in property, and reared a family of ten children. After he became prosperous, however, he became faithless to his wife and consorted with other women, which conduct on his

part was endured by the wife for years because of her love for the family and her desire to avoid the disgrace of a divorce.

In 1907 they sold their lumber business in Greenville to the older two sons for $8,000, which was paid in the form of notes, which were equally divided between the father and mother. In 1908 there was a mutual division of the title to the real estate accumulated through their joint efforts, because he was at that time contemplating the purchase of a large track of timber, in the South and desired to mortgage his property for the purpose of raising money for that purpose, and his wife did not wish to join in the scheme. The property conveyed to her at that time was approximately of the value of $7,250, and the properties left in the complainant were variously estimated to be worth from $20,000 to $36,000. His conduct with relation to other women continued, however, and finally culminated in February, 1911, in her retaining the defendant Palmer to file a bill for divorce, which was later dismissed by her. During the fall and winter of 1911 and 1912 he lived with another woman, who afterward brought suit against him for breach of promise of marriage.

In the summer of 1911 one of his daughters, becoming ill, was advised by her physician to go to California, whither she was accompanied by her mother, Mr. Dallavo providing part of the money necessary for the expenses of the trip. She left Grand Rapids in August, 1911, and returned October 14th of the same year. The complainant came to the house where she was staying and saw the mother and children, and visited with them. In September, while she was in California, he went to Grand Haven, Mich., and through an attorney there filed a bill for divorce, alleging that he was a resident of Ottawa county, and that his wife

189 Mich.—23.

was then living in California. In November, 1911, for the purpose of obtaining substituted service in his divorce proceedings he went to Grand Haven and made the affidavit that his wife was not a resident of Michigan but a resident of California, and in June, 1912, he again went to Grand Haven, and obtained a decree of divorce on his own testimony, without any knowledge of the divorce proceedings being imparted to any of his family until some time after the decree. He met his wife a few days after the decree, but said nothing to her, and she thereupon went to Pittsburg to visit a sister, and on July 12, 1912, he married the complainant Marie Brooks Dallavo, who was at that time between 17 and 18 years of age.

The first one of the family to talk with Dallavo about his divorce was his son Joe, who lived at Greenville, and who saw a notice of the marriage in the paper, and informed his mother about it. On her return to Grand Rapids in August, 1912, to visit her daughter, she called at the office of the prosecuting attorney of Kent county, to inquire as to the legality of the divorce proceedings, which were prosecuted without notice to her. The assistant prosecutor who advised with her said he would write to Dallavo and ask him to come in and explain the proceedings, which he did. The next morning, about 5 o'clock, Dallavo called his wife by telephone, and requested an interview with her apart from the children, which she granted. When she met him he begged her not to make complaint against him, and not to have him sent to jail. After some talk it was agreed that if no trouble was made for him he would give her a deed to a farm at Wyman and pay her $30 a month for the support of the three minor children as long as they remained in school. They went to the office of a notary public, where this agreement was carried out, a deed being made to their daughter Louise, she in turn deeding to her mother.

The complainant thereupon requested her to give him a release in writing, which the defendant said she could not do until she had seen an attorney.

The same day she took a train and went to Stanton, Mich., where she interviewed the defendant L. C. Palmer, her attorney, who returned that evening with her to the city of Grand Rapids. Complainant met them at the depot, and he was there informed that the matter was entirely in the hands of Mr. Palmer for settlement. The next morning Mr. Palmer came to the office of Grove & Davis, who were then representing the complainant in some litigation in the courts of that county, and inquired whether or not they had represented the complainant in the divorce proceedings in Grand Haven. Mr. Palmer told Judge Grove certain things that he believed to be true concerning the divorce proceedings. Thereupon Mr. Davis left a telephone call for the complainant to call at their office. Mr. Palmer went to Grand Haven to examine the divorce proceedings, and upon his return called on Grove & Davis, and informed them of the nature of the proceedings in Grand Haven, and of his intention to file a petition to set aside the divorce. Mr. Dallavo, with his son Joe, called at the office of Grove & Davis, and the whole matter was talked over between Messrs. Palmer, Grove, Davis, Dallavo, and his son. Mr. Davis advised Mr. Dallavo and his son Joe of the serious character of the claims that Mr. Palmer had made with reference to the divorce proceedings, and that if they were true they might constitute the basis of charges of perjury and possibly bigamy. The son Joe thereupon stated that the father desired to avoid publicity and have the affair settled up, and suggested that they have a talk with the mother, who was then at the daughter's home. The son Joe and Mr. Palmer thereupon went to the place where defendant was staying to talk over the settlement. That evening the

son Joe again met the complainant and told him that the mother would accept nothing less than the Finch property.

The next day Mr. Palmer continued negotiations with Grove & Davis and Dallavo along the lines suggested by the son Joe, and it was insisted that Mrs. Dallavo should give him a life lease of the property, which at first Mr. Palmer declined to do, but after another interview with Mrs. Dallavo, was agreed upon. The signature of the new wife being necessary to the conveyance, it was arranged that Mr. Dallavo should go to Sand Lake, where his wife was visiting her people, and bring her and her father, who was a justice of the peace, to a conference the next day. They did come the next day, and Judge Grove and Mr. Davis explained to the wife and her father the situation, and what was proposed by way of an adjustment. Upon being told that if the arrangement was carried out the decree of divorce would be enrolled so that her rights as his wife would be established, she and her father advised the settlement and lease, which were duly executed and delivered a few days later. It was also agreed on the part of Dallavo that the property should be relieved from incumbrance. After the settlement had been executed, and before the papers were recorded, Dallavo obtained a loan of $4,000 from a building and loan association, which had no knowledge of the conveyances, and secured it by a mortgage on the Finch property executed by himself and his wife Marie.

It is the claim of the complainant—and he so testified—that during these proceedings he was nervous, excited, and very much worried and scared, and that it was under threats of prosecution for perjury and bigamy that he agreed to deed the Finch property to the defendant; and that he did so only because of these threats that were made against him, and because he was fearful of being arrested.

It is denied on the part of both Mr. Davis and the defendant Palmer that any threats were made, and that any pressure was made upon him to make a settlement. The son Joe also testified that not only was no threat or expression of intention to prosecute made, but his mother had stated to him that she would not take any action against his father in court, even if he should refuse to make the provision for the family which they had demanded; but he did not claim that he told his father. He said that his father cried and bemoaned the fact that he was going to lose so much property, but said that he had seen him cry hundreds of times, and Mrs. Dallavo says that these penitential tears had often flowed freely when he was called to account for wrongdoing, until he had been forgiven. The daughter characterised them as "crocodile tears."

The learned trial judge who heard the testimony and who saw the witnesses on the witness stand, in determining the question of fact, and speaking of the testimony of John Dallavo, said:

"In regard to that I am convinced that every disputed question of fact must be determined without reference to his testimony. His deceitful conduct toward his former wife, Henrietta Dallavo, his apparent readiness to perjure himself in the divorce suit, and his reckless and unfounded sworn allegations in this bill forbid my placing the slightest credence in his testimony."

With this conclusion we are in accord. We do not believe that his testimony on disputed questions of fact is entitled to any credence. It is very apparent from a reading of this record that through all the negotiations with reference to the transfer of property, the complainant had the benefit of the advice of competent and experienced counsel. Judge Grove, a lawyer of unquestioned standing at the bar, testified:

"From the beginning to the end, Mr. Davis talked over the matter with me from time to time, and he in

my judgment was unusually cautious and careful trying to protect Mr. Dallavo just as far as he possibly could. I never knew a case where an attorney seemed to be more earnest in his efforts to protect a client than Mr. Davis showed all the way through."

It appears that even his attorneys did not advise him to make this settlement, advising him only to exercise his own judgment, based upon a knowledge of the facts. He undoubtedly made the settlement, knowing the consequences of what might follow if he did not make it. But we think that it clearly appears that he made it only after deliberation and after having had the advice of his son Joe, his new wife, and her father.

The legal question as to what constitutes duress has quite recently had the consideration of this court, in the case of *Clement* v. *Mercantile Co.*, 172 Mich. 243 (137 N. W. 657), and what was said there by Mr. Justice STEERE is clearly applicable here:

"The law does not recognize duress by mere suggestion, advice, or persuasion, especially where the parties are at arm's length, and represent opposing interests. 9 Cyc. p. 443. * * * The only duress claimed is *per minas*—by threats and intimidation. To constitute this, it must appear that the party coerced was so intimidated and moved by the threats made as to cease to be a free moral agent, and became so bereft of those qualities of the mind essential to entering into a contract as to be incapacitated to exercise his free will power in that connection. * * * As a rule, duress will not prevail to invalidate a contract entered into with full knowledge of all the facts, with ample time and opportunity for investigation, consideration, consultation, and reflection. Clement knew the facts in this case, was given ample opportunity, and invited to investigate, and was free to consult with whomsoever he saw fit."

Likewise in this case, it clearly appears that Dallavo was informed with reference to all the facts concerning the situation which confronted him. He knew

the facts better than any other person. He was given ample opportunity to investigate, and was invited to, and did consult with whomsoever he saw fit. Undoubtedly he weighed in his mind the consequences that might result from his failure to make the agreement that he did, but we are not convinced that simply because he bemoaned the condition that he found himself in, he was "so bereft of those qualities of the mind essential to entering into a contract as to be incapacitated to exercise his free will power in that connection." We think that he did exercise his free will power, and that therefore the testimony does not sustain the claim of duress as to himself.

The fact that he comes into a court of equity with unclean hands should not, under the authority of _Briggs_ v. _Withey,_ 24 Mich. 136, necessarily deny him the right to relief, but it does not relieve him from the necessity of convincing the court of the fact that the arrangement that he made was one procured by fraud or by duress _per minas._

We also agree with the conclusion of the trial judge that the deed signed by the present wife was without legal consideration so far as she was concerned, and that it was proper to preserve to her her dower rights. _Clement_ v. _Mercantile Co., supra._

The contract provided the following as consideration moving to Dallavo:

"In consideration of the faithful performance of the agreements and undertakings to be performed by first party, as hereinbefore recited, said second party does hereby undertake to support the minor children of said parties hereto, the issue of the marriage theretofore existing between said parties, and said second party also hereby acknowledge receipt and payment in full of all dues, demands, and claims of every name and nature existing at this date."

At the time of the settlement there were three minor children, and we think that the agreement in the con-

tract on her part to support those children was a sufficient consideration under the circumstances of this case to sustain the settlement as made.

The decree also properly provided that the complainants should pay the mortgage placed by them on the Finch property, and by consent of the parties the deed to the daughter Louise and the one by her to her mother of the farm at Wyman was set aside.

The trial judge made a proper disposition of the case before him, and we therefore affirm his decree, except as to dismissing the bill, with costs to the defendants.

BROOKE, C. J., and PERSON, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.