AMERICAN NATIONAL BANK OF LAKE CRYSTAL v. J. S. HELLING AND OTHERS.[1]

January 30, 1925.

No. 24,164.

**Contract to protect guilty person from prosecution void.**

1. A contract to make restitution of property stolen or embezzled, made under an agreement to protect the guilty person from prosecution, is void and the courts will give no aid to either party, unless it was executed under duress.

**Who may assert duress.**

2. It is the general rule that only the person threatened with prosecution can assert such threats as constituting duress, and then only where he was not guilty of the offense charged. But a person from whom payments or securities have been extorted by threats to prosecute a near relative may assert duress, and may do so whether such relative was guilty or innocent.

[1]Reported in 202 N. W. 20.

**Definition of duress.**

3. Duress consists in subjecting a person to a pressure which overcomes his will and coerces him to comply with demands to which he would not have yielded if he had been acting as a free agent.

**Who may not assert duress.**

4. Ordinarily a person who enters into a contract with knowledge of all the facts, and after advising with his friends and his attorney, and after ample time for reflection, cannot sustain a claim of duress.

**Finding not sustained by evidence.**

5. The finding that the contract in controversy was executed under duress is not justified by the evidence.

Action in the district court for Blue Earth county to recover $1,994. The case was tried before Olsen, J., and a jury which returned a verdict in favor of defendants J. S. Helling and Elvin G. Helling for $10,970.63. From an order denying its motion for judgment notwithstanding the verdict or for a new trial, plaintiff appealed. Reversed and judgment directed for plaintiff.

*C. J. Laurisch* and *Alfred W. Mueller,* for appellant.

*Einar Hoidale* and *John Lind,* for respondents.

TAYLOR, C.

Plaintiff brought this action to recover $1,994 as the value of certain bonds which defendants had agreed to transfer to plaintiff by a contract executed November 12, 1921. Clifford Helling, although named as a defendant, was not served and did not appear in the action. J. S. Helling and Elvin G. Helling, who will be designated as defendants hereafter, asserted that the contract had been executed by them under duress, and interposed a counterclaim to recover back the payments previously made under the contract. At the opening of the trial they admitted that plaintiff was entitled to recover the amount claimed unless they established their charge of duress and their right to recover on their counterclaim. The amount of the counterclaim was also admitted. The court instructed the jury to return a verdict of $2,234.60 for plaintiff, unless they found that the contract had been obtained by duress, and if they

so found to return a verdict of $10,970.63 for defendants. The jury found for defendants in the amount stated. Plaintiff appealed from an order denying its alternative motion for judgment or a new trial.

Clifford Helling resided at Lake Crystal and was the cashier of plaintiff bank to which he had given a surety bond in the sum of $10,000 for the faithful performance of his duties as such cashier. His parents resided in the village of Hanska and owned a farm of 379 acres a few miles from the village. His older brother, the defendant S. L. Helling, called Sidney in the record, resided upon and operated the farm. His other brother, the defendant Elvin G. Helling, was manager of the Farmers Elevator at Hanska.

Clifford had embezzled over $45,000 of the bank's funds. The contract in question was executed by Clifford as party of the first part, by defendants as party of the second part, and by the bank as party of the third part. By its terms Clifford and defendants agreed to transfer and convey to the bank certain properties therein specified, and in consideration thereof the bank satisfied and discharged all its claims against Clifford and agreed to make no claim against the surety on his bond. The contract was carried out in all respects, except that defendants failed to turn over the bonds for which plaintiff seeks to recover in this action.

Defendants received their first information that Clifford was in trouble from their mother on October 16, 1921. The next day Sidney went to Clifford's home and found his parents there. Clifford was then negotiating with one L. P. Jones for a loan, and told Sidney and his father that he would turn over everything to raise $18,000 in money. They supposed this was the amount of his shortage. On October 19, 1921, his parents executed a mortgage to Jones on the farm for $18,000 and Sidney executed a chattel mortgage to Jones as further security. As a part of this transaction Clifford transferred all his property to Sidney as security for the liability assumed by his father and Sidney. Although the mortgages were delivered to Jones, he failed to furnish the money and they never went into effect.

On October 28, 1921, Sidney, Elvin and Emil G. Hage, a banker of many years experience and a life-long friend of the family, met

at the elevator in Hanska, apparently by previous arrangement. Later Clifford and George W. Champlin, an attorney of Lake Crystal, arrived. Champlin had the Jones mortgage but had drawn a new mortgage for $18,000 running to the bank, and, according to Sidney, stated that, if it was not executed, Clifford would be reported to the bonding company, and they knew what would follow. Sidney asked for the old mortgages, but Champlin refused to give them up until the new one was executed. The five went from the elevator to the home of the parents and the parents signed the new mortgage. It was not acknowledged, however, and was retained by Sidney and in fact was never delivered and never went into effect. While at the house it was arranged that Sidney should go to Lake Crystal the next day. At the instance of Hage, who acted as one of the advisers of defendants throughout the remainder of the negotiations, Henry Somsen of New Ulm was employed as attorney for defendants and their parents. On Saturday, October 29, 1921, Sidney, Somsen and Hage met Champlin and three of the directors of the bank, Lamoreaux, James and Upson, at the office of Lamoreaux & Champlin in Lake Crystal. Sidney and Hage testified that at this conference Upson stated that a telegram was ready which would be sent to the bonding company unless a settlement was made, and that Somsen replied that they would have to send it, if they wished, as he did not represent Clifford but only the defendants and their parents. Defendants refused to deliver the new mortgage and Somsen demanded the return of the Jones mortgage which Upson then had. Upson refused to return it. No settlement was made or agreement reached at this conference. An examination of the bank had been begun by the national bank examiners but the amount of the shortage was not then known. After the meeting on the twenty-ninth, Mr. Somsen, Mr. Hage and Sidney saw Mr. Wilson, the attorney for the bank, at his office in Mankato, and through him arranged for Mr. Hage to go into the bank and make an examination on their behalf to ascertain the amount of the shortage. On Monday, October 31, Mr. Hage began his examination and completed it November 8, 1921. He found that Clifford's shortage amounted to the sum of $45,619. The bank examiner made it somewhat larger.

The parents of the defendants were in poor health. On October 31, their father became seriously ill and died November 2, 1921. Following the funeral their mother also became ill. They claim, and doubtless truly, that fear of the effect which the arrest of Clifford would have upon their mother impelled them to make the settlement in controversy.

Mr. Hage, having completed his examination of the books, arranged for a meeting with the bank officials on November 9, 1921, at the office of Mr. Wilson in Mankato. At this meeting defendants were accompanied by Mr. Somsen, their attorney, by Mr. Hage, by Mr. Schlaben, an uncle by marriage, and by Mr. Anderson, a cousin who was cashier of the bank at Hanska. Late in the afternoon Mr. Somsen and Mr. Hage had an interview with Mr. Wilson, attorney for the bank, in which the terms of settlement were discussed and "a tentative agreement arrived at." In the evening they all went to Mr. Wilson's office, and met the president of the bank and several of the directors. Mr. Somsen enumerated the properties which they were willing to turn over. The principal item was a half interest in a mortgage of $21,000. The directors were not satisfied with the amount offered. Mr. Somsen reminded them that his clients owed the bank nothing and were offering $8,000 more than the amount of Clifford's bond. He wanted it understood that the bond would be released and canceled if the settlement was made, and was assured that it would be. He also wanted an understanding or assurance that no criminal proceedings would be instituted. The bank officials assert that they emphatically refused to give any such assurance. When it appeared that the total amount to be turned over, including Clifford's property, aggregated only $18,000, Mr. Upson, one of the directors, was unwilling to consider the proposition further. But they finally separated with the understanding that the directors would satisfy themselves as to the value of the mortgage the next morning, and that they would meet again at Lake Crystal the next afternoon. The next morning, November 10, 1921, Hage was told by the national bank examiner that Clifford would be arrested, and he told Clifford, Sidney and Elvin what the examiner had said. In the afternoon of the tenth, Sidney, Elvin,

Hage and Schlaben met with Clifford at Clifford's home in Lake Crystal. A little later, Mr. Norman, president of the bank, and Mr. Frederickson, a director, came to the house and, according to Sidney, had a private talk with Clifford, and then said that the bank examiner had finished his examination and was leaving and

"that we would either have to make good now or they would catch the examiner on the train at Mankato and that Clifford's arrest would follow, that he would swear out a warrant for Clifford unless we came across with this money."

Sidney asked for an hour in which to consider the matter. They assented and said that he would find them at the telephone office. (The telephone office was Upson's office.) After the bank officials left, defendants discussed the matter with Hage and Schlaben. Sidney, asked what Hage and Schlaben advised them to do, answered:

"I can't remember just exactly as they advised me as to any sum that I should turn over to these men or as to the terms to make with them, but they did tell me to tell them that Clifford had decided to take his medicine."

Hage, asked what advice he gave them, answered:

"I stated that there was nothing in the world that could save Clifford from prosecution on account of the things he had done at the bank; that it didn't make any difference if the money was paid in, and I advised Sidney to go to the telephone office and tell the directors that Clifford had decided to take his medicine; that he would turn over all his money to the bank and plead guilty to any charge placed against him."

About half an hour after the bank officials had left, Sidney went to the telephone office and reported that defendants would carry out the proposition, and arranged for a meeting at the bank in the evening. Sidney, Elvin and Schlaben went to the bank in the evening. Most of the directors and Champlin were there. At this meeting it was agreed that the properties enumerated at the Mankato meeting would be transferred to and accepted by the bank, and Champlin drew up a memorandum of the terms of the settlement. But Sid-

ney announced that he would not execute any contract unless it was drawn by his attorney, Mr. Somsen; and the meeting ended with the understanding that they would meet at Mr. Somsen's office in New Ulm the next day to execute the contract and deliver the deeds and other papers. On November 11, 1921, Sidney went to New Ulm and had Somsen prepare the deeds and other papers which were to be delivered to the bank. Elvin and the bank officials did not go to New Ulm until the next day, November 12, 1921. After their arrival, Somsen prepared the contract. It was executed by Clifford, Sidney, Elvin and the bank, and the deeds and other papers prepared on the eleventh were then delivered.

Defendants say that they made the settlement to save Clifford from arrest, and that when they executed the contract the bank officials promised that they would see that he was not arrested. The bank officials deny making any such promise.

On completing his examination, the bank examiner reported his findings to the United States district attorney who caused Clifford to be arrested for violation of the national banking laws. This action was taken without the knowledge of any of the bank officials. Clifford subsequently pleaded guilty and was committed to the state reformatory.

In the preceding summary we have taken defendants' version where the facts are in dispute. It is proper to say that the bank officials denied ever making any threats to prosecute Clifford or ever giving any assurance that he would not be prosecuted.

The controlling rules of law are fairly well settled. A contract to reimburse the owner for property stolen or embezzled made under an agreement to protect the guilty person from criminal prosecution, or to conceal the crime, or to withhold or suppress evidence of it, is void as an attempt to obstruct the enforcement of the laws and the court "will leave the parties where it finds them." It will give no aid to either. Wells v. Floody, 155 Minn. 126, 192 N. W. 939, 33 A. L. R. 776; 6 R. C. L. 758, 759, 762; 17 A. L. R. 325, note; 32 A. L. R. 422, note; 15 Ann. Cas. 310, note; Ann. Cas. 1914A, 520, note. But, if the execution of the contract was procured by duress, the parties are not deemed to be in pari delicto and payments or

conveyances obtained during the continuance of the duress may be recovered or annulled.

Threats of a criminal prosecution may constitute duress. But the law favors the prosecution of the guilty, and it is the general rule that threats to prosecute a guilty person for the crime which he has committed do not place him under duress within the meaning of the law. Some courts hold that such threats do not bring him within the doctrine of duress under any circumstances. See Union Exchange Nat. Bank v. Joseph, 231 N. Y. 250, 131 N. E. 905, 17 A. L. R. 323. Other courts hold that such threats, if made for the purpose of compelling the guilty person to make restitution, may constitute duress as between him and the threatener. See Morse v. Woodworth, 155 Mass. 233, 27 N. E. 1010, 29 N. E. 525; Fountain v. Bigham, 235 Pa. St. 35, 80 Atl. 131, Ann. Cas. 1913D, 1185. It is not necessary to determine in this case which rule applies in this state, for the parties invoking the doctrine were not accused of any crime and no threats were made against them.

It is the general rule that only the person threatened with prosecution can assert such threats as constituting duress, but there is a well-established exception to this rule. One from whom payment of a claim, or security for it, is extorted by threats to prosecute another to whom he is nearly related by blood or marriage may predicate duress upon such threats. 13 C. J. 404, and cases cited. Where the claim of duress is based on threats to prosecute a near relative, it is well settled that the fact of his guilt or innocence is immaterial. 17 A. L. R. note at page 342; 13 C. J. 404; Burton v. McMillan, 52 Fla. 469, 42 South. 849, 8 L. R. A. (N. S.) 991, 120 Am. St. 220, 11 Ann. Cas. 380, and note at page 385. In such cases the question is whether the one asserting the duress was subjected to a pressure which overcame his will and coerced him to comply with demands to which he would not have yielded if he had been acting as a free agent.

"As a rule, duress will not prevail to invalidate a contract entered into with full knowledge of all the facts, with ample time and opportunity for investigation, consideration, consultation and reflec-

tion." Clement v. Buckley Mercantile Co. 172 Mich. 243, 137 N. W. 657; Dallavo v. Dallavo, 189 Mich, 350, 155 N. W. 538; Wolff v. Bluhm, 95 Wis. 257, 70 N. W. 73, 60 Am. St. 115; Bennett v. Luby, 112 Wis. 118, 88 N. W. 37.

Here defendants had full knowledge of all the facts. The negotiations extended over a period of two weeks during which they consulted with close friends and relatives who were active and experienced business men, and also had the aid and advice of able counsel. Their refusal to deliver the mortgage signed at the instance of Champlin and their final refusal to execute any contract not drawn by their own attorney is an indication that they were not under the domination of others but were exercising an independent judgment. The facts in this case differ widely from the facts in the case of Brown County Bank v. Hage, 156 Minn. 460, 195 N. W. 275. The controlling element in that case was evidence to the effect that the defendant had suffered a physical and mental breakdown of such seriousness that he was not in a condition to transact business, coupled with the fact that he acted without having disinterested advice. That case rested on its own peculiar facts and was recognized as barely within the operation of the doctrine.

The record in the present case shows that the defendants were in full vigor and possessed strong and allert minds. Their desire to soften the blow to their mother and to shield Clifford and save the family name from stain, as far as possible, was the impelling cause which induced them to make the contract. But they knew that the Federal bank examiners had ascertained all the facts; and they were told, and must have known, that neither they nor the bank officials could prevent Clifford's arrest. They dealt with the bank at arm's length. For approximately $18,000 they secured the release and discharge of an undisputed claim of more than $45,000 against Clifford and the cancelation of a bond which secured $10,000 of that amount. This fact is not of special importance in the present case, for the question here is whether the evidence is sufficient to sustain a finding that the defendants were under such constraint that they were not in condition to make a valid contract. A careful examination of the record satisfies us that the facts will not

justify a finding that the defendants were influenced or dominated by the representatives of the bank to such an extent that they lacked capacity to enter into a binding contract. They had ample time for reflection and did not act until after full consultation with their friends and counsel. And the proposition which they undertook to carry out was a proposition which they themselves had made to the bank, not one which the bank had made to them.

At the opening of the trial defendants stipulated that plaintiff was entitled to judgment for the amount claimed unless they established their claim of duress. As the evidence will not sustain a finding of duress, plaintiff is entitled to judgment as stipulated.

Order reversed and judgment directed for plaintiff.

The Chief Justice took no part.