The BANK OF TUCSON, an Arizona corporation, Plaintiff,

v.

Henry J. ADRIAN, aka Henry T. Adrian, aka Henry J. Adrian (Bessesen), aka Henry A. Bessesen, aka Henry J. Bessesen, aka Henry Adrian, B. A. Adrian, Henry A. Bessesen, Monica B. Bjornnes, and John T. Bessesen, Defendants.

No. 4–63 Civ. 364.

United States District Court
D. Minnesota,
Fourth Division.

Oct. 30, 1964.

Order Jan. 20, 1965.

James S. Simonson, of Cant, Haverstock, Beardsley, Gray & Plant, Minneapolis, Minn., for plaintiff.

John J. Kelly, Minneapolis, Minn., for defendants Henry A. Bessesen, B. A. Adrian Bessesen, and John T. Bessesen.

Thomas Vennum and Jerrold F. Bergfalk, of Vennum, Newhall, Ackman & Goetz, Minneapolis, Minn., for defendant Monica Bjornnes.

NORDBYE, District Judge.

This cause came before the Court for trial without a jury.

The suit involves a promissory note in the sum of $24,214.30, together with interest and attorneys' fees. It is admitted that the note was executed and delivered to plaintiff by the defendants in the City of Minneapolis, Minnesota, on May 29,

1963, and was due 90 days after the date of execution. Defendants Monica B. Bjornnes and John T. Bessesen, sometimes referred to hereafter as Monica and John, deny liability by reason of lack of consideration and duress. Defendant Henry J. Adrian, also known by other names as indicated in the caption, but referred to hereafter as Henry A. Bessesen, and his wife, B. A. Adrian Bessesen, admit the execution of the note as alleged and that they owe the amount set out in plaintiff's complaint, but they deny that any sums are now due by reason of an alleged agreement with plaintiff to the effect that it would extend the note for 90 day periods upon payment by these two defendants of small amounts on the principal and the interest thereon, and they contend that they have offered to pay the interest and $500 on the principal and have requested plaintiff to grant the extension allegedly agreed upon, but plaintiff has refused to do so. Hence, they take the position that, in view of this oral agreement and the tender, the note is not now due.

■■ The defense of Henry A. Bessesen and his wife can be disposed of at the outset. Their defense cannot be sustained by reason of their attempt to vary the terms of a written instrument by parol evidence, and furthermore, the weight of the evidence will not sustain the agreement which they assert. The defense of Monica B. Bjornnes, the sister of Henry A. Bessesen, and John T. Bessesen, a brother of Henry A. Bessesen, presents questions which require a somewhat extended discussion of the evidence.

In May, 1963, defendant Henry A. Bessesen was a resident of Tucson, Arizona, and in business in that city. He had a bank account with the plaintiff entitled "Second Fund Tucson Inn," and the authorized signatures to the account were Henry A. Bessesen and his wife, who then used the names of Henry Adrian and B. A. Adrian. Apparently, the "Second Fund Tucson Inn" was a corporation, with Henry A. Bessesen as President and his wife as Secretary, and so far as the evidence disclosed, these two were the only stockholders. Henry A. Bessesen, either under the name of "Second Fund Tucson Inn" or in trade names which he used, had bank accounts in several of the larger cities throughout the country, and during the period of May, 1963, and immediately prior thereto, began the practice of kiting checks with reference to deposits in the various bank accounts which he controlled, as the result of which the bank account of "Second Fund Tucson Inn" became depleted by his fraudulent practices to the extent of some $23,700. When this shortage was called to his attention, he readily admitted the amount due the plaintiff bank, and in that plaintiff feared that his practices had caused losses to other banks which would be pressing their claims, it attempted to obtain payment of its loss from Henry without any delay. It appears that the losses sustained by the plaintiff bank were being investigated by an official Bank Examiner or examiners, and that the Federal Bureau of Investigation had made some investigation with reference thereto. When Henry was interviewed by plaintiff's bank officials and its attorneys, he merely asked for a reasonable time to obtain funds to cover the loss and stated that it would take him about three weeks to get the money. The bank officials demurred to the time requested, and then Henry suggested that he had friends and relatives in Minneapolis from whom he could obtain the necessary funds. He suggested that he wanted to go alone to Minneapolis and that his sister there had securities which could be utilized for the payment of his shortage in plaintiff's bank within three weeks. The bank officials, lacking trust in the promises of Henry, insisted on accompanying him to Minneapolis and that the trip should be made forthwith. Thereupon, the President of the bank and its attorney arranged for the purchase of airplane tickets to Minneapolis for themselves and Henry and his wife. The tickets for the latter were paid for by the bank. The four arrived in Minneapolis on Tuesday, May 28, 1963. After their arrival the plaintiff's representatives found that the securities which Henry claimed to have

access to were either non-existent or unavailable, and then they insisted that they would not extend the payments due the bank over ten days and would require a promissory note for the amount due signed by Henry and his wife, with cosigners acceptable to the bank. Henry was informed that, upon his failure to provide the bank with satisfactory security, felony charges against him would follow.

Henry immediately got in touch with his brother, John, and his brother-in-law, one Alfred O. Bjornnes, and a meeting was arranged with the bank representatives. At this meeting, John and Alfred O. Bjornnes were told by the bank representatives that Henry had committed a felony, and unless something was done about it immediately, both Henry and his wife would go to jail. They insisted that both John and Bjornnes should sign a note with Henry and his wife guaranteeing the amount due payable in ten days. Bjornnes refused to be a party to the transaction. John was asked by the bank representatives if he would put a second mortgage on his house as part of the guaranty which the bank insisted upon. When John indicated that he might consider doing so, he was informed later that that type of security would not be suitable, and that if the bank was not able to get the money from Henry, it would have to take a promissory note from him with joint makers approved by the bank. When Bjornnes refused to sign a note as a guarantor, the bank insisted on having Monica—Bjornnes's wife and Henry's sister—on the note. John apparently was agreeable to execute the note as a co-maker. Bjornnes, however, objected to the plan of having his wife interviewed, stating that she had undergone an illness and was in no position to be subjected to the mental distress which would undoubtedly follow in the event she was informed of Henry's predicament. However, the bank representatives insisted that Monica be told about Henry's trouble, and although there is a dispute in the testimony as to what Monica was to be told, the evidence fully

supports a finding that John was told by the bank representatives that not only should Monica be informed of the seriousness of Henry's predicament, but that if she was not willing to sign as a guarantor or co-maker of the proposed promissory note the result would be that Henry would go to jail. Moreover, there can be no question in light of the evidence that John carried out the instructions of the plaintiff and informed Monica that she would either have to sign the note or Henry would go to jail. When Monica received that message from John, she became highly nervous and distraught, and although her husband, Bjornnes, advised his wife not to become a party to the note, she was convinced from the information she received from John that the bank's ultimatum was that either she should become a party to the note or her brother Henry would be jailed on felony charges.

It is clear from the evidence that she believed and relied upon the statements which the bank representatives made to John, and which John reiterated to her. The family relationship among these brothers and sisters was close, and it is evident from the testimony that both Monica and John dreaded the thought of Henry's going to jail, with the inevitable publicity which would follow and which would stain the family name. There can be no question but that the motivating force which caused these two defendants to sign the note in question was the fact that they firmly believed that if they failed to do so, the only alternative would be that their brother would go to jail. The fact that Monica had no conversations with the bank representatives prior to signing the note seems immaterial; that is, it was the purpose and intent of plaintiff's agents that Monica should be informed by John of the consequences which would follow if she refused to become a signer to the note. John was delegated by them to carry the information, which he did relay. The note was prepared on May 29, 1963, the day after the bank officials arrived in Minneapolis and originally it was written to be due

in ten days after date, but later the ten days was excised and changed to 90 days to comply with Henry's suggestion in that regard. Henry, his wife, and John signed the note on May 29th. On May 30, 1963, Monica signed the note. There is evidence that before she signed it, she went with Henry to see the latter's lawyer, but there is no showing that Monica sought the lawyer's advice, or that she attempted to discuss the factual situation with him. She testified, and there is no denial of her testimony, that the lawyer merely stated "Do you know what you are signing?" and she said, "I know it is a note." She further testified that "I asked him if I didn't sign it, if it meant my brother would go to jail, and he admitted that it did. I said, then I have to sign it."

█ In view of the fact that the bank granted Henry an extension of time within which to pay the note, to wit, 90 days, it would seem that sufficient consideration existed by reason thereof to invalidate that defense to the note on that ground. Therefore, the question is whether or not the defendants John and Monica have sustained the burden of proof as to the defense of duress as enunciated by the Minnesota decisions. The Court has been referred to American National Bank of Lake Crystal v. Helling, 161 Minn. 504, 202 N.W. 20 (1925); St. Paul Mercury Indemnity Co. v. Guntzburger, 199 Minn. 289, 271 N.W. 478 (1937); Steblay v. Johnson, 194 Minn. 352, 260 N.W. 364 (1935); Quinn v. United States Fidelity & Guaranty Co., 163 Minn. 320, 204 N.W. 156 (1925); Brown County Bank v. Hage, 156 Minn. 460, 195 N.W. 275 (1923); O'Neil v. Dux, 257 Minn. 383, 101 N.W.2d 588 (1960); and Malmquist v. McChord, 179 Minn. 17, 228 N.W. 167 (1929).

It is quite apparent that the Minnesota courts recognize that there may be duress where security or payment is furnished for one related by blood or marriage under threats that the person so related would be prosecuted for a crime unless the security or payment is made. As stated in American National Bank of Lake Crystal v. Helling, supra (p. 511, 161 Minn., p. 23, 202 N.W.),

"* * * In such cases the question is whether the one asserting the duress was subjected to a pressure which overcame his will and coerced him to comply with demands to which he would not have yielded if he had been acting as a free agent."

█ As stated, it is evident that both Monica and John firmly believed that it was either a question of jail for Henry or the execution of the note in question by them. Monica was an emotional type of person who became so upset by the ultimatum delivered to her that she went ahead and became a co-maker of the note regardless of the fact that her husband strongly advised against it. She had had no experience in business, and it is entirely reasonable to find that the threats of jail for her brother entirely controlled her will when she was confronted with the ultimatum made by the bank.

Admittedly, the factual situation may not be so strong in John's behalf. He was in the advertising business and was forty-five years of age. He had a high school education and had been in the Army, where he attained the rank of Captain. At one time he formed an advertising company which had business throughout the entire United States. In 1962 he became connected with a company which was engaged in selling premium merchandise similar to that carried on by a trading stamp company. In May, 1963, he was connected with a concern known as Business Travelers Internationale, a company which employed about four employees. Consequently, it must be recognized that John was a man of varied business experience. However, he consulted no one as to the advisability of doing that which he did. As soon as he heard of the eventualities which would follow in absence of Henry's furnishing some security to satisfy the bank, he agreed to furnish a second mortgage on his home. Obviously, he did not owe the bank anything and it is quite evident that Henry had no available assets which he could utilize to satisfy the bank so as to avoid

criminal prosecution. It seems clear, therefore, that as soon as John heard of Henry's predicament and the ultimatum of the plaintiff, he succumbed to their demands. If John's situation is to be considered a border-line case as to duress, the Court's view is that the scales fairly tip in his favor in establishing this defense. As stated, the plaintiff's representatives arrived on May 28, 1963. John signed the note on May 29th. To agree to pay the bank some $24,000 within 90 days was undoubtedly an impossible obligation for him to perform. Moreover, Henry's promise to defray his indebtedness within 90 days was likewise visionary, but, notwithstanding, John took it upon himself with Monica to shoulder an obligation for which neither was responsible.

In concluding that both of these defendants have sustained the burden of proof as to duress, the Court is mindful that it cannot determine with absolute certainty the effect on their minds as to the alternative of prison for Henry if they did not sign the note. Each case necessarily must be determined on its own peculiar circumstances. Certainly, these defendants honestly believed that, if they did not respond to the bank's demands, Henry would go to jail. Admittedly, family bonds differ in various groups. Here, as stated, the evidence suggests a very close relationship between these brothers and sisters. Under these circumstances, it is difficult to escape the conclusion that they were subjected to a pressure which dominated and overcame their will. They owed the bank nothing. They were in no way responsible for Henry's misdoings. Without consulting anyone, John was ready, at the first discussion with the bank's representatives, to place a second mortgage on his house as security. How can it be said that a person exercises his free will when he or she has no alternative but to sign a proffered promissory note for a substantial sum or be subjected to the disgrace and suffering attendant to a brother's being committed to prison?

In addition to the foregoing, reference should be made to Section 613.65, Minn. Stat.Ann., which was in full force and effect in Minnesota in May, 1963, and which reads:

"Every person who shall take money or other property, gratuity, or reward, or an engagement or promise therefor, upon any agreement or understanding, express or implied, to compound or conceal a crime or violation of a statute, or to abstain from, discontinue, or delay a prosecution therefor, or to withhold any evidence thereof, except in a case where a compromise is allowed by law, shall be guilty * * * of a felony."

Reference also should be made to the well-recognized principle of law enunciated in American Natl. Bank of Lake Crystal v. Helling, supra (p. 510, 161 Minn., p. 22, 202 N.W.),

"The controlling rules of law are fairly well settled. A contract to reimburse the owner for property stolen or embezzled made under an agreement to protect the guilty person from criminal prosecution, or to conceal the crime, or to withhold or suppress evidence of it, is void as an attempt to obstruct the enforcement of the laws and the court 'will leave the parties where it finds them.' It will give no aid to either."

And see O'Neil v. Dux, supra, p. 388, 257 Minn., p. 22, 202 N.W.

True, a well-informed person would immediately recognize that the bank could not control the activities of the Bank Examiners, the Federal Bureau of Investigation, or other law enforcement agencies, if a felony had been committed by Henry, but that the bank would refrain from initiating any criminal complaint was the unquestioned agreement of the bank when the note was signed, and that there would be no criminal prosecution of any kind was the unquestioned implication in the negotiations when these two defendants understood that it was either jail for their brother

or a fulfillment of the bank's demands. Common justice strongly supports a finding that there was an agreement to stifle criminal prosecution, and under such circumstances the law will leave this plaintiff without any relief against these two defendants.

The note calls for attorneys' fees. Plaintiff has proven attorneys' fees and costs to the extent of $5,387.70. The reasonableness of the fees and expenses incurred is not controverted.

The Court adopts the foregoing as its Findings of Fact, and upon said findings makes the following Conclusions of Law:

1. That plaintiff is entitled to judgment against Henry A. Bessesen, also known as Henry J. Adrian, and B. A. Adrian, also known as B. A. Adrian Bessesen, in the sum of $24,214.30, with interest at the rate of six per cent from May 29, 1963, and attorneys' fees and costs in the sum of $5,387.70.

2. That plaintiff is not entitled to recover from Monica B. Bjornnes and John T. Bessesen, or either of them, and that these defendants, and each of them, are entitled to recover their costs and disbursements herein.

Judgment will be entered in accordance with the foregoing Conclusions of Law. Exceptions are reserved.

## ORDER

Plaintiff has made a motion in the above proceeding to amend the findings of this Court relative to the finding of duress as to the defendants Monica Bjornnes and John T. Bessesen, and as to the finding that plaintiff promised that criminal prosecution would not follow if the note in question was signed by these two defendants.

As to the question of the sufficiency of the evidence to establish duress, plaintiff relies primarily on American National Bank of Lake Crystal v. Helling, 161 Minn. 504, 202 N.W. 20. But clearly the facts in the Helling case are readily distinguishable from those in the instant proceeding. Here, these two defendants had no alternative but to sign the note or suffer the family disgrace of their brother going to jail. This was the ultimatum made by the plaintiff and to that ultimatum both of these defendants surrendered. These defendants, as distinguished from the Helling case, never made any proposition to plaintiff looking to a compromise so as to absolve their brother from being prosecuted criminally. Here, the ultimatum made by the plaintiff was that the defendants had to sign the note or "your brother goes to jail." These defendants never consulted any lawyer as to their rights or as to the course that they should pursue under the circumstances. All of the conferences between plaintiff and these defendants occurred in a matter of less than two days. It is an entire misconstruction of the evidence to conclude that Monica consulted a lawyer. The only contact with an attorney was that she was brought to Henry's lawyer, who after being informed by Monica that she knew that she was signing a note, merely told Monica in response to her question, "I asked him if I didn't sign it, if it meant my brother would go to jail, and he admitted that it did. I said, then I have to sign it." Not only does the evidence fairly sustain the Court's finding that these defendants were acting under duress when they signed the note, but in addition the note contract was tainted with "an attempt to obstruct the enforcement of the laws" which requires that the Court will render no aid to the plaintiff.

Concededly, the question of duress is a matter that must depend on the facts presented in any particular situation. Observation of the defendants on the witness stand and an appraisal of all the evidence introduced by the parties fully justify the views set forth in the Court's findings and conclusions herein.

After due consideration, the Court concludes that the plaintiff's motion must be in all things denied. It is so ordered. An exception is reserved.