**GOODYEAR TIRE & RUBBER COMPANY, HOUSTON CHEMICAL PLANT, Appellant,**

v.

**Max SANFORD, Appellee.**

**No. 1273.**

Court of Civil Appeals of Texas, Houston (14th Dist.).

July 21, 1976.

Rehearing Denied Sept. 8, 1976.

Richard R. Brann, Baker & Botts, Houston, for appellant.

George Dixie, Chris Dixie, Dixie, Wolf & Hall, Houston, for appellee.

J. CURTISS BROWN, Chief Justice.

This is a suit to vacate a labor arbitrator's award.

Max Sanford (Sanford or appellee) filed suit in the district court of Harris County against Goodyear Tire & Rubber Company, Houston Chemical Plant (Goodyear or appellant) seeking to vacate a labor arbitration award. The arbitrator had upheld Sanford's discharge by Goodyear. After a non-jury trial, the trial court entered a judgment that vacated the arbitrator's award, reinstated Sanford as an employee of Goodyear in the same position that he would have been in had he not been terminated, and awarded Sanford back pay. Goodyear has perfected this appeal. Points attacking the judgment of the trial court have been duly filed by appellant on all available grounds.

Most of the facts relevant to this appeal have been stipulated by the parties. On October 6, 1971 Sanford, while in the employment of Goodyear, was involved in an altercation with his supervisor, Ray Graves. Sanford accused Graves of striking him. On October 8 Sanford's labor union representatives filed a grievance on his behalf, requesting "that immediate and positive action be taken regarding this matter." On the same day Sanford filed simple assault charges against Graves in the Municipal Court of Houston.

At the time of this incident there was a labor agreement between Goodyear and Local 347, International Union of Operating Engineers, of which Sanford was a member. Article IV(C) of the agreement provided that

> "neither party shall bring suit or other action in the court or a public administrative agency on any matter of dispute which is subject to the grievance procedure until said procedure has been exhausted. . . . "

On October 21 Goodyear notified Sanford that his employment was being terminated because he had violated this provision.

On October 27, Sanford's union filed another grievance on his behalf, this one seeking Sanford's reinstatement and Graves's removal from a supervisory capacity. After a hearing at which Sanford and several other persons testified, the arbitrator upheld Sanford's discharge. Sanford then filed suit in the district court claiming that Goodyear had breached the collective bargaining contract between Goodyear and Local 347 by discharging him without "just cause." The trial court vacated the arbitrator's award on the ground that "it is con-

trary to accepted public policy since it imposes a restriction on the right of citizens to prompt, uninhibited access to our Criminal Courts to redress violations of Texas Penal laws."

 Section 301 of the Labor Management Relations Act, 1947, 29 U.S.C. § 185, gives United States district courts jurisdiction of "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . or between any such labor organizations. . . . " Section 301 did not divest state courts of jurisdiction of suits for violations of contracts between employers and labor organizations. *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962). However, the federal courts have been authorized to fashion a body of federal law for the enforcement of collective bargaining agreements, and it is this federal law that governs. *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). A state law that is compatible with the purpose of § 301 may be "absorbed" as federal law in order to find and apply the rule that will best effectuate the federal policy. *Id.* Incompatible doctrines of local law must give way to principles of federal law. *Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). Section 301 applies equally to suits brought by individual employees seeking to protect their rights under collective bargaining agreements as to suits in which a labor organization is a party. *Smith v. Evening News Association,* 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962).

This appeal presents us with three questions: (1) Does the federal law recognize public policy as a proper basis on which a court may vacate (or refuse to enforce)[1] a labor arbitration award? (2) Does the award in the instant case contravene a federal public policy or a state public policy that is not inconsistent with federal policy?

(3) Should the award be vacated in the instant case?

The first question, then, is whether federal law recognizes public policy as a proper basis on which a court may vacate a labor arbitration award. The starting point in this inquiry must of necessity be *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), one of the famous *Steelworkers Trilogy,* in which the Court said:

"The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards. . . .

". . . Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Id.* at 596–97, 80 S.Ct. at 1361.

 Thus, it is appropriate that we recognize at the outset the very limited scope of review given to courts when they are asked to enforce or vacate an award made by a labor arbitrator. It is clear that "if, by reason of expansive judicial oversight, the risk of judicial displacement of the award were to become substantial, the workability of the system would be seriously jeopardized." Dunau, *Scope of Judicial Review of Labor Arbitration Awards,* N.Y.U. 24th Conf. on Lab. 175, 177 (1972).

 Nonetheless, exceptions have been recognized that go beyond the literal language in *Enterprise* that the award must

---

1. In this opinion the use of the word "vacate" also includes the meaning "or refuse to enforce."

draw its essence from the collective bargaining agreement. For example, it has been held that a labor arbitration award which requires one or both parties to violate the law will not be enforced. *Glendale Manufacturing Co. v. Local 520, ILGWU,* 283 F.2d 936 (4th Cir. 1960), *cert. denied,* 366 U.S. 950, 81 S.Ct. 1902, 6 L.Ed.2d 1243 (1961). If the award is arbitrary, capricious, or not adequately grounded in the basic collective bargaining contract, it will not be enforced. *Dallas Typographical Local 173 v. A. H. Belo Corp.,* 372 F.2d 577 (5th Cir. 1967).

Further, it is possible that the United States Arbitration Act, 9 U.S.C. § 1 (1970) may apply to suits founded on LMRA § 301. If so, the provisions of § 10 of that Act could be considered additional exceptions to the general rule of non-reviewability. Of particular interest in the instant case is § 10(d), which requires vacation of the award "[w]here the arbitrators exceeded their powers. . . . " Though the Supreme Court has not yet decided the issue, numerous lower courts have concluded that labor arbitration awards are within the scope of the Arbitration Act. See, *e. g., International Association of Machinists v. General Electric Co.,* 406 F.2d 1046 (2d Cir. 1969); *Newark Stereotypers' Local 18 v. Newark Morning Ledger Co.,* 397 F.2d 594 (3d Cir.), *cert. denied,* 393 U.S. 954, 89 S.Ct. 378, 21 L.Ed.2d 365 (1968); *Pietro Scalzitti Co. v. Operating Engineers Local 150,* 351 F.2d 576 (7th Cir. 1965).

Besides the instances mentioned above, a number of federal courts have suggested that labor arbitrators' awards which contravene public policy will be vacated. See *Local 453, Electrical Workers v. Otis Elevator Co.,* 314 F.2d 25 (2d Cir.), *cert. denied,* 373 U.S. 949, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963); *Metal Products Workers Local 1645 v. Torrington Co.,* 358 F.2d 103, 106 (2d Cir. 1966); *Machinists District 8 v. Campbell Soup Co.,* 406 F.2d 1223 (7th Cir.), *cert. denied,* 396 U.S. 820, 90 S.Ct. 57, 24 L.Ed.2d 70 (1969); *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1128–29 n. 27 (3d Cir. 1969); *Botany Industries, Inc. v. New York Joint Board, Amalgamated Clothing Workers,* 375 F.Supp. 485, 490–91 (S.D.N. Y.), *vacated as moot sub nom. Robb v. New York Joint Board, Amalgamated Clothing Workers,* 506 F.2d 1246 (2d Cir. 1974); *Local 1852, Waterfront Guard Association v. Amstar Corp.,* 363 F.Supp. 1026, 1033 (D.Md.1973); *UAW Local 985 v. W. M. Chace Co.,* 262 F.Supp. 114 (E.D.Mich.1966); cf. *Washington-Baltimore Newspaper Guild Local 35 v. Washington Post Co.,* 143 U.S. App.D.C. 210, 442 F.2d 1234, 1239 (1971); *Gulf States Telephone Co. v. Local 1692, Electrical Workers,* 416 F.2d 198, 201 (5th Cir. 1969).

In *Local 453, Electrical Workers v. Otis Elevator Co., supra,* the case most often cited for this proposition, the court said:

"It is no less true in suits brought under § 301 to enforce arbitration awards than in other lawsuits that the 'power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States. * * * ' *Hurd v. Hodge,* 334 U.S. 24, 34–35, 68 S.Ct. 847, 852–53, 92 L.Ed. 1187 (1948). The public policy to be enforced is a part of the substantive principles of federal labor law which federal courts, under the mandate of *Textile Workers Union of America v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), are empowered to fashion. Cf. *Local 174, Teamsters, etc., v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). Thus, when public policy is sought to be interposed as a bar to enforcement of an arbitration award, a court must evaluate its asserted content." *Id.* at 29.

In addition, numerous commentators have concluded that labor arbitrators' awards may be overturned on public policy grounds. See Blumrosen, *Public Policy Considerations in Labor Arbitration Cases,* 14 Rutgers L.Rev. 217 (1960); Griffin, *Judicial Review of Labor Arbitration Awards,* 4 Suffolk L.Rev. 39, 62–67 (1969); Jones, *The Nature of the Court's "Jurisdiction" in Statutory Arbitration Post-Award Motions,*

46 Calif.L.Rev. 411 (1958); Markham, *Judicial Review of an Arbitrator's Award under Section 301(a) of the Labor Management Relations Act,* 39 Tenn.L.Rev. 613, 636–42 (1972); Symposium-Arbitration and the Courts, 58 Nw.U.L.Rev. 466, 545–56 (1963); Note, Judicial Review of Labor Arbitration Awards After the Trilogy, 53 Cornell L. Rev. 136, 145–47 (1967).

█ Based on the above authorities, we conclude that public policy is a proper basis on which a court may vacate a labor arbitration award. While it is federal law that controls in this instance, we note that a number of state courts have reached the same or a similar conclusion. Cf. *Smith v. Gladney,* 128 Tex. 354, 98 S.W.2d 351 (1936); *Black v. Cutter Laboratories.* 43 Cal.2d 788, 278 P.2d 905 (1955), *petition for cert. dismissed,* 351 U.S. 292, 76 S.Ct. 824, 100 L.Ed. 1188 (1956); *Avco Corp. v. Preteska,* 22 Conn.Sup. 475, 174 A.2d 684 (1961); *Tandy v. Elmore-Cooper Live Stock Commission Co.,* 113 Mo.App. 409, 87 S.W. 614 (1905); *Western Union Tel. Co. v. American Communications Ass'n,* 299 N.Y. 177, 86 N.E.2d 162 (1949).

Having answered the first question in the affirmative, we turn to the second question: Does the award in the instant case contravene a federal public policy or a state public policy that is not inconsistent with federal policy?

The labor agreement forbade either party from bringing "suit or other action in the court or a public administrative agency on any matter of dispute which is subject to the grievance procedure until said procedure has been exhausted." *As interpreted by the arbitrator,* this provision forced those who desired to use the grievance procedure to delay the filing of any criminal charges growing out of the incident until after the procedure had been exhausted. There is testimony in the record indicating that it is not unusual for completion of the grievance procedure to require several months. We note that in the present case the formal award of the arbitrator was dated 104 days after the incident and 83 days after appellee's second grievance was submitted. The terms of the labor agreement require that "[a]ll employee grievances must originate in the first step of the grievance procedure within five (5) working days of their occurrence."

The agreed stipulation between the parties contained an offer of a Houston attorney who was familiar with such practice to testify that "the practice and policy of both the City Attorneys assigned to the Municipal Courts as well as to the Houston Police Department is not to accept complaints of simple assault against any individual unless the complaints are filed soon after the conduct giving rise to the filing of the assault charges." Even without such a policy we could not ignore the reality that a delay in the prosecution of a criminal case almost invariably works to the disadvantage of the prosecution. Thus, any substantial delay has the effect of hindering law enforcement.

█ There can be no doubt that an agreement that has the effect of delaying the reporting or prosecution of violations of the law is contrary to the public policy of the United States. In the case of *In re Quarles,* 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1895), the Supreme Court stated:

"It is the duty and the right, not only of every peace officer of the United States, but of every citizen, to assist in prosecuting, and in securing the punishment of, any breach of the peace of the United States. It is the right, as well as the duty, of every citizen, when called upon by the proper officer, to act as part of the posse comitatus in upholding the laws of his country. It is likewise his right and his duty to communicate to the executive officers any information which he has of the commission of an offense against those laws. . . .

"The right of a citizen informing of a violation of law, like the right of a prisoner in custody upon a charge of such violation, to be protected against lawless violence, does not depend upon any of the amendments to the constitution, but arises out of the creation and establishment by the constitution. itself of a na-

tional government, paramount and supreme within its sphere of action. . .

"The right of the private citizen who assists in putting in motion the course of justice, and the right of the officers concerned in the administration of justice, stand upon the same ground. . . . " *Id.* at 535–36, 15 S.Ct. at 960–61.

An agreement which tends to stifle criminal prosecution is void as an attempt to obstruct the enforcement of the laws. *Bank of Tucson v. Adrian,* 245 F.Supp. 595 (D.Minn.1964), *aff'd per curiam sub nom., Bank of Tucson v. Bjornnes,* 351 F.2d 949 (8th Cir. 1965). "It is public policy . . . everywhere to encourage the disclosure of criminal activity. . . . " *Lachman v. Sperry-Sun Well Surveying Co.,* 457 F.2d 850, 853 (10th Cir. 1972).

Such an agreement also violates the public policy of the State of Texas. Cf. *Merrell v. Timmons,* 138 Tex. 250, 158 S.W.2d 278 (1941); *Wegner Bros. v. E. J. Biering & Co.,* 65 Tex. 506 (1886); *Prim v. Farmers' Nat. Bank,* 44 S.W.2d 943 (Tex.Com.App.1932, holding approved); *Duncan v. Piper,* 79 S.W.2d 172 (Tex.Civ.App.-Dallas 1935, no writ); *Robertson v. Shinn Grocery Co.,* 34 S.W.2d 367 (Tex.Civ.App.-Austin 1930, writ ref'd); *Bradley v. Gilliam,* 260 S.W. 289 (Tex.Civ.App.-Dallas 1924, no writ).

Appellant emphasizes that appellee was not obligated to use the grievance procedure; from this it reasons that appellee's discharge was not on account of his institution of criminal charges, but rather was because he attempted to invoke criminal procedures after he had *voluntarily* decided to use the grievance procedure. This argument misses the point. It was the very choice offered appellee that offended public policy. For the orderly functioning of our society, people must be completely free from all forms of coercion against reporting violations of the law. Indeed, it is their duty to do so. *In re Quarles, supra.* As interpreted by the arbitrator, an agreement such as the present one tends to entice them away from the prompt performance of that duty by offering some benefit in return—

here the availability of the grievance procedure. As a result, the interest of the public in seeing that law violators are brought to justice is likely to be thwarted.

■ We hold that the award of the arbitrator under article IV(C) of the labor agreement in question is repugnant to both federal and state public policy to the extent that it forces employees using the grievance procedure to delay the filing of criminal charges growing out of the subject matter of the grievance until the grievance procedure has been exhausted.

Having concluded that public policy is a proper basis on which a court may vacate a labor arbitrator's award, and that the award in the instant case does contravene public policy, we now address the question of whether the present award should be vacated.

■ A number of commentators have suggested that courts should use a balancing approach in determining whether a labor arbitration award should be vacated on public policy grounds. See Griffin, *Judicial Review of Labor Arbitration Awards,* 4 Suffolk L.Rev. 39 (1969); *Symposium—Arbitration and the Courts,* 58 Nw.U.L.Rev. 466, 545 (1963); Note, *Judicial Review of Labor Arbitration Awards After the Trilogy,* 53 Cornell L.Rev. 136 (1967). At least two federal courts have expressly employed such an approach. See *Botany Industries, Inc. v. New York Joint Board, Amalgamated Clothing Workers, supra; Local 1852, Waterfront Guard Association v. Amstar Corp., supra.* We agree that a balancing of policies is called for, and feel that the following commentary reflects a reasonable means of utilizing such an approach:

"Accepting the necessity of some judicial review into the merits of arbitration awards, the problem becomes one of how much and under what circumstances. Although tests have been devised to resolve these issues, the nature of the problem is not susceptible of determination by hard and fast rules. Each case presents unique circumstances which require a careful weighing of particular matters of public policy. Given the diverse settings

in which such policy may require departure from the arbitration ideal, it is submitted that the only workable approach is a balancing of policies on an *ad hoc* basis.

"If arbitration is to be an effective means of settling disputes, the primary objective must be to give arbitration awards maximum finality. Other important legislative and judicial policies, however, cannot be ignored. In each case, the policy favoring arbitration must be balanced against the particular *public* policy allegedly violated. In order to promote the policy favoring arbitration to the fullest extent possible, only *clear* violations of important public policies should justify the vacating of awards." *Symposium—Arbitration and the Courts, supra* at 548 (footnotes omitted).

Relying on *Washington-Baltimore Newspaper Guild Local 35 v. Washington Post Co., supra,* and *Gulf States Telephone Co. v. Local 1692, Electrical Workers, supra,* appellant argues that the arbitrator's award in the instant case should be upheld because it did not *compel* conduct contrary to public policy. There is dicta in these opinions that supports this proposition, and it is true that until the grievance was actually filed appellee was not compelled to refrain from reporting the assault to law enforcement officials. However, we decline to adopt this dicta as an absolute rule. We feel that the better approach is to let such factors be a consideration in the balancing of the conflicting policies.

On the one hand, then, we have a strong national policy favoring arbitration as a means of settling labor disputes. Each time a court overturns an arbitrator's award the finality of such awards is diluted and the attractiveness of the arbitration system is diminished in the eyes of those it was designed to serve. On the other hand, we have the policy favoring enforcement of criminal laws, and disfavoring conduct which tends to interfere with effective law enforcement. As we noted previously, delay in the reporting or prosecution of violations of criminal law works to the disadvantage of the public interest in the prompt disposition of criminal charges.

It is our opinion that in this case the policy favoring effective law enforcement must prevail. The policy of keeping people completely free from coercion against filing criminal complaints is of paramount importance to the orderly functioning of our society. In virtually any criminal case substantial delay is a serious obstacle for the prosecution to overcome. Further, if we were to hold otherwise, it is all too likely that in the future other employees, in order to take advantage of the right to bring a grievance, would forego their right and duty of reporting similar criminal violations until the grievance procedure had been exhausted.

A proceeding by a criminal court is not to adjudicate private rights, but to effectuate a public policy. Such proceedings are not an alternate remedy to the grievance procedure. Therefore, any coercion used to discourage, retard, or defeat free access to the criminal courts is beyond the legitimate interests of an employer. All of appellant's points have been carefully considered and are overruled. The judgment of the trial court is affirmed.

Affirmed.