Sonic Knitting Industries, Inc., demandante y recurrente, *v.* International Ladies Garment, Etc., demandada y recurrida.

*Número:* R-76-417     *Resuelto:* 30 de noviembre de 1977

*Nigaglioni, Palou & Ledesma,* abogados de la recurrente; *Francisco Aponte Pérez,* abogado de la recurrida.

*Número:* R-76-417     *Resuelto:* 8 de marzo de 1978

558

*Nigaglioni, Palou & Ledesma,* abogados de la recurrente; *Francisco Aponte Pérez,* abogado de la recurrida; *Lespier & Toro,* abogados del *Amicus Curiae,* Asociación de Industriales de Puerto Rico.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

Sonic Knitting Industries, Inc., decidió trasladar su fábrica de Hato Rey a Morovis. El patrono notificó de esta relocalización a la International Ladies Garment Workers Union (ILGWU), entidad que representaba a los obreros. Patrono y unión llegaron a un acuerdo para que se le indemnizara una cantidad razonable, tanto a aquellos empleados que decidieran mudarse a Morovis como a los que escogieran no hacerlo. Tres empleados se mudaron y seis se quedaron en los locales de Hato Rey.

Los empleados de Hato Rey decidieron desligarse de la ILGWU. Pidieron la descertificación de la unión ante la Junta Nacional de Relaciones del Trabajo. La mayoría de los empleados votó para descertificar la unión. Esta impugnó la elección ante la Junta. Fue anulada fundándose en que el patrono había realizado actividades encaminadas a ayudar a los obreros a lograr la descertificación de la unión.

De acuerdo con el Art. XXII[1] del Convenio Colectivo la unión solicitó se sometiera a arbitraje si el patrono había violado el Art. II de dicho Convenio el cual prohibía que el pa-

---

[1] El Art. XXII del Convenio Colectivo expresa en su parte pertinente:

". . . The award of the Arbitrator shall be final and binding provided to conform to law. In addition to granting such other relief as he may deem proper, the award of the Arbitrator may contain provisions directing or restraining acts and conduct of the parties."

trono ayudara a desalentar a los obreros a pertenecer a la unión. David M. Helfeld, árbitro seleccionado por las partes, rindió un laudo preliminar en el cual determinó que el patrono había permitido que los obreros del taller de Hato Rey se trasladaran a Morovis en horas laborables con el propósito de gestionar apoyo de los obreros que allí trabajaban para descertificar la unión. También encontró probado que el abogado del patrono ayudó desmedidamente a los obreros de Hato Rey al conseguirles una cita en la Junta Nacional de Relaciones del Trabajo. Concluyó que debía conceder daños a favor de la unión.

La unión reclamó un total de $61,850.00 en daños que dividió en varias partidas. Solicitó $1,260 por cuotas estimadas según el Convenio Colectivo vigente; $8,640 por cuotas estimadas según el Convenio programado para los próximos 3 años y $15,000 por concepto de cuotas a los planes de bienestar y salud y otros fondos bajo el Convenio Colectivo, programado para los siguientes 3 años. También solicitó $1,950 para gastos del litigio, $20,000 por daños a los empleados de Sonic, $10,000 por daños a los empleados de Caribbean Leisurewear Inc. y sus afiliadas y $5,000 por daños a empleados de otros patronos de la misma industria.

Luego de varias vistas en las que se desfiló prueba sobre los daños, el árbitro determinó que el patrono debía pagar a la unión una cantidad equivalente a las cuotas de todos los nuevos empleados que hubiesen pasado el período de prueba hasta cierta fecha, las contribuciones al plan de salud y bienestar por 7 meses con los correspondientes informes debidamente llenados, el reembolso de los gastos del litigio, $1,950 y $10,000 por concepto de daños y perjuicios por la pérdida de la capacidad para negociar y otros daños relacionados con la representación.

El patrono radicó acción de nulidad del laudo ante el Tribunal Superior, Sala de San Juan. La unión solicitó se dictara sentencia sumaria alegando que no existía controversia

alguna sobre hechos materiales. El tribunal accedió concluyendo que el árbitro tenía facultad para conceder daños. Inconforme, el patrono solicita revisión.

Se nos plantea una cuestión novel. Habiéndose establecido que el árbitro deberá emitir su laudo conforme a derecho, debemos determinar si éste excedió sus poderes al conceder daños a la unión sin haberse estipulado en el acuerdo de sumisión ni en el convenio colectivo la concesión de ese remedio. Véase *Junta Relaciones del Trabajo* v. *N.Y. & P.R. S/S Co.*, 69 D.P.R. 782, 801–802 (1949).

El acuerdo de sumisión sometido por la ILGWU al árbitro planteaba la siguiente controversia:

"Did Employer violate Article II[2] (Union Recognition) by engaging in conduct which had the purpose and effect of discouraging membership in the Union?"

La autoridad del árbitro para entender en un procedimiento de arbitraje emana del acuerdo de sumisión y del convenio colectivo existente entre patrono y unión. *J.R.T.* v. *Otis Elevator Co.*, 105 D.P.R. 195 (1976), *Colón Molinary* v. *A.A.A.*, 103 D.P.R. 143, 148–149 (1974), *J.R.T.* v. *N.Y. & P.R. S/S Co.*, supra; *United Steelworkers* v. *Enterprise Corp.*, 363 U.S. 593, 597 (1960). Se ha sostenido que el poder para la concesión de un remedio, ya sea el cumplimiento específico, *injunctions* o daños, debe surgir de la sumisión o del convenio. Fleming, *Arbitrators and the Remedy Power*, 48 Va. L. Rev. 1199 (1962). Sin embargo, el desarrollo jurisprudencial—*United Steelworkers* v. *American Mfg. Co.*, 363 U.S. 564 (1960); *United Steelworkers* v. *Warrior and G. Nav. Co.*, 363 U.S. 574 (1960); *United Steelworkers* v. *Enterprise Wheel and Car Corp.*, supra—ha ido ampliando la autoridad del árbitro dentro del proceso de arbitraje laboral, limitando

---

(2) Establece el Art. II, inciso (1) del Convenio Colectivo que:

"The Employer hereby recognizes the Union as the sole and exclusive collective bargaining agent for all of the workers covered by this agreement. Neither the Employer nor any of its agents shall directly or indirectly discourage membership in the Union."

el poder de los tribunales para revisar los laudos. Powers, *Arbitration as a Remedy in Labor Disputes*, 18 Clev.-Mar. L. Rev. 586 (1969). De la misma forma, se ha extendido el poder arbitral para la concesión de remedios. *Steelworkers* v. *Enterprise*, supra, pág. 597. Actualmente la tendencia es conceder mayor latitud a los árbitros en la confección de remedios en sus laudos.

■ En el ámbito de los laudos de arbitraje, los árbitros han enfatizado su autoridad para conceder el remedio de daños y perjuicios cuando el convenio colectivo o el acuerdo de sumisión le conceden expresamente ese poder y aun también cuando el acuerdo o el convenio nada dicen sobre este remedio. [3] Elkouri & Elkouri, *How Arbitration Works*, págs. 236–237 (Ed. 1960). Véase *Vulcan Mold & Iron Co.*, 52 L.A. 396, 402 (1967). A estos efectos se expresó en *Lodge #12, District #37, International Ass'n of Machinists* v. *Cameron Iron Works, Inc.*, 292 F.2d 112, 119 (5th Cir.), *cert. den.* 368 U.S. 926 (1961), que ". . . en ausencia de lenguaje claramente restrictivo, se debe conceder gran latitud en la confección de un remedio apropiado que constituya la decisión del árbitro." *College Hall Fashions Inc.* v. *Phil. Joint Board, Amalgamated Clothing Workers of America*, 408 F.Supp. 722, 728 (E.D. Pa. 1976); *Texas Gas Transmission Corp.* v. *Int'l Chemical Workers*, 200 F.Supp. 521, en reconsideración, 527 (S.D. N.Y. 1959), Stutz, Arbitrators and the Remedy Power, *Labor Arbitration and Industrial Change, National Academy of Arbitrators, Proceedings 16th Annual Meeting*, (1963), pág. 54.

Es de acuerdo con estos conceptos que el árbitro concedió una partida de $10,000.00 en daños a favor de la unión en adición a otras medidas monetarias remediales. Creyó el árbitro que la violación al convenio por parte del patrono debía

---

[3] Antes de la trilogía "Steelworkers" los árbitros normalmente se circunscribían al remedio expresamente concedido en el convenio colectivo o en el acuerdo de sumisión.

conllevar un remedio que resarciera los daños sufridos por la unión. *Cf. U.T.I.E.R.* v. *J.R.T.*, 99 D.P.R. 512, 525 (1970). Véase también *Atomic Uniform Corp.* v. *ILGWU*, 86 L.R.R.M. 2331 (1973), *Glendale Mfg. Co.*, 32 L.A. 223, 226 (1959).(⁴)

Aunque en la sumisión no se incluyó una solicitud para la concesión de daños, resultaba razonable que el árbitro pudiera conceder una indemnización si llegaba a la conclusión de que el patrono había actuado en forma irrazonable. Esto es así porque ciertamente resultaría inconsecuente que el árbitro concluyera que el patrono había intervenido activamente en la acción de descertificación, sin imponerle una sanción. Sería ésta la única manera de desalentar al patrono a que actuara en igual forma en el futuro. Si no se le imponía una sanción podría intentar una y otra vez la descertificación sin consecuencia alguna.

"El mandato expreso del árbitro [en este caso] fue solamente determinar si había ocurrido un incumplimiento de contrato. No se hizo ninguna mención expresa para la formulación de un remedio. Sin embargo, aun cuando una controversia delimitada se somete a un árbitro éste debe tener considerable latitud en confeccionar el laudo. [Citas de casos omitidas.] Porque una rectificación de los daños causados por un incumplimiento de contrato está estrechamente unida a la identificación del incumplimiento mismo, esa latitud incluye el remediar un daño. [Cita de caso omitida.]" *International U. of Op. Eng. Local No. 450* v. *Mid-Valley, Inc.*, 347 F.Supp. 1104, 1109 (S.D. Tex. 1972). Véase también *Mogge* v. *District 8, Int'l Ass'n of Machinists*, 454 F.2d 510, 514–515 (7th Cir. 1971). No es razonable que un árbitro tenga poder para entender en una controversia entre patrono y

---

(⁴) Aunque estos casos envuelven situaciones en las que la unión expresamente solicitó daños al árbitro, las mismas no dejan de ser similares a la situación y la cláusula del Convenio Colectivo envueltas en el caso de autos.

unión sin tener autoridad para imponer el remedio que creyera propicio de acuerdo al laudo emitido. *In the Matter of Port Washington Union Tree School District* v. *The Port Washington Teachers Association,* 384 N.Y.S.2d 206 (App. Div. 1976), Fleming, *op. cit.,* págs. 1214–1215.

*Se confirmará la sentencia recurrida.*

El Juez Asociado Señor Díaz Cruz disintió en opinión separada a la cual se une el Juez Asociado Señor Martín. El Juez Asociado Señor Rigau no intervino.

—O—

Opinión disidente del Juez Asociado Señor Díaz Cruz a la que se une el Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 30 de noviembre de 1977

Con inexplicable abstracción de las dificultades que confronta el país para fomentar nuevas industrias y conservar las existentes, este Tribunal se asocia al experimento inaugurado por un árbitro para imponer fuertes sanciones económicas, no acordadas en el convenio colectivo, a una industria que tanto sus trabajadores como empresarios luchan por salvar del cierre. Nótese que digo experimento porque el propio árbitro admite en su laudo que la sanción es rara en los Estados Unidos y desconocida hasta ahora en Puerto Rico. En este caso que sienta precedente de incuestionable trascendencia para la economía del país, que particularmente afecta el sector laboral, la mayoría opta por el experimento académico en proceso deliberativo de combustión interna, a costa del bienestar de los trabajadores y empresarios afectados. Cosas veredes mío Cid.

El Derecho enajenado de la realidad circunstancial frustra y anula la misión básica de este Tribunal.

La recurrente Sonic Knitting Industries, Inc., se dedica a la fabricación de ropa, bajo condiciones económicas difíciles, afectada de modo "particularmente fuerte" por la mala

situación general de esa industria textil. (Opinión Preliminar del Arbitro, pág. 7.) Tenía un convenio colectivo firmado por tres años con la International Ladies Garment Workers Union (ILGWU) en cuyo Art. II([1]) el patrono recurrente reconocía a la Unión como la representante exclusiva de todos los empleados cubiertos por el convenio y se obligaba a no desalentar, directa o indirectamente, la afiliación a la Unión. El Art. XXII del convenio establecía un procedimiento para resolver cualquier controversia en torno a su aplicación o interpretación, designaba árbitro al Prof. David M. Helfeld y disponía que el laudo del árbitro sería conforme a derecho, final y obligatorio. Se le facultó para conceder el remedio que estimase apropiado al caso y para emitir órdenes restringiendo actos y conducta de las partes, ajustándose a los méritos del caso y al convenio colectivo. Surgió un movimiento de los trabajadores para desautorizar([2]) la Unión y ésta alegó intervención indebida del patrono para alentar la repudiación. El acuerdo de sumisión de la disputa al árbitro fue el siguiente: "¿Violó el patrono el Art. II sobre reconocimiento de la Unión, al seguir un curso de conducta que tenía el propósito y efecto de desalentar la afiliación de los trabajadores a la Unión?"

El árbitro celebró vistas, oyó a las partes y concluyó que el patrono había violado el Art. II del convenio colectivo mediante prácticas que desalentaban la permanencia e ingreso de miembros a la Unión. Su laudo final además de ordenar a la recurrente que cesara y desistiera de la práctica ilícita entre otros remedios le ordenó pagar a la Unión una cantidad equivalente a cuotas no descontadas y aportaciones a los

---

([1]) Article II: Union Recognition

"1. The Employer hereby recognizes the Union as the sole and exclusive collective bargaining agent for all of the workers covered by this agreement. Neither the Employer nor any of its agents shall directly or indirectly discourage membership in the Union."

([2]) Los trabajadores no sólo repudiaban, sino que mantenían una actitud hostil a la Unión. (Laudo Preliminar, págs. 13–14.)

Fondos de Bienestar no remitidas bajo el convenio, limitadas a períodos que terminaban el 27 de agosto de 1975; la suma de $1,950.00 por concepto de costas, más $10,000.00 como indemnización de daños y perjuicios sufridos por la Unión por "pérdida de su poder de negociación y daños incidentales." El patrono instó demanda ante el Tribunal Superior, Sala de San Juan, impugnando el laudo, que dictó sentencia sumaria desestimando la impugnación y ordenando a la recurrente acatar y cumplir la decisión arbitral.

Notamos la disposición preceptiva del convenio colectivo en cuanto a que el laudo debía ser *conforme a derecho* (3) y expedimos auto de revisión.

La imposición de una penalidad que no es parte expresa de los acuerdos en la negociación colectiva debe estar moderada por una discreción arbitral contenida por principios de política pública que se dirigen a la protección de la paz industrial. El árbitro que se sienta a resolver disputas a nivel de taller o planta, no puede prescindir para su solución, de las costumbres y prácticas de la factoría o industria en particular según recogidas en los respectivos convenios. El árbitro es parte del régimen laboral del gobierno interno constituido sobre las reglas que el patrono y la Unión han acordado, y es por tanto un factor indispensable en el proceso continuo de negociación colectiva. *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960). La adhesión por el árbitro a esas reglas, su lealtad al convenio colectivo al aplicarlas e interpretarlas, es lo que en nuestro Derecho ha llevado el laudo de arbitraje al punto de respetabilidad en que la negativa de los tribunales a revisar sus

---

(3) Esta condición franquea la intervención judicial para revisar la legalidad del laudo.

". . . [L]a regla de autorrestricción judicial de que este Tribunal no revisará laudos de arbitraje respecto al derecho o ley aplicable, excepto que determinada ley, o las partes—en el acuerdo de sumisión o en el convenio colectivo—exijan que se decida conforme a derecho." (Citas.) *Colón Molinary* v. *A.A.A.*, 103 D.P.R. 143, 155 (1974).

méritos es la correcta actitud judicial hacia el arbitraje bajo acuerdos de negociación colectiva. Con esa finalidad intervienen los tribunales únicamente en los casos de excepción reconocidos en la jurisprudencia, a saber, fraude, conducta impropia, falta de debido proceso, de jurisdicción, insuficiencia de decisión respecto a todas las cuestiones en disputa o conflicto con la política pública. *Colón Molinary* v. *A.A.A.* 103 D.P.R. 143, 155 (1974).

La cuestión de interpretación del convenio colectivo es asunto para el árbitro. Fue la interpretación del árbitro la que acordaron aceptar las partes; y en cuanto la decisión del árbitro concierna a su interpretación del contrato, no corresponde al tribunal revocarla porque su propia interpretación difiera de aquella. *United Steelworkers of America* v. *American Mfg. Co.*, 363 U.S. 564, 568 (1960).

El problema que el presente caso plantea es que el árbitro sobrepasó los linderos de la interpretación para entrar al campo de la provisión de remedio tan extremoso y lesivo en su aplicación a una de las partes, que no es concebible que éstas lo hubieran contemplado sin haberlo hecho parte específica del convenio colectivo. De mayor exigencia era la expresa autorización al árbitro para condenar al pago de daños y perjuicios, cuando dicha condena no reivindica el derecho personal de ninguno de los unionados y por el contrario representa una inesperada regalía para una poderosa unión nacional a costa de una pequeña fábrica luchando por sobrevivir.

En nuestro diario quehacer difícilmente hay contrato que mejor refleje en su letra la voluntad deliberada, estudiada y calculada de las partes contratantes que un convenio laboral colectivo. Representa el producto destilado de esforzadas, extenuantes y muchas veces angustiosas negociaciones entre los dos lados de la mesa. Es el balance final, el punto medio donde se han encontrado y coincidido la unión y el patrono luego de una serie de concesiones de una parte a la otra que

necesariamente implican beneficios económicos que una gana y que la otra pierde. Si al cabo de este laborioso proceso ambas partes acuerdan que un árbitro sea el único juez de las disputas que surjan bajo el régimen contractual que cuidadosamente se han dado, no es concebible que la sumisión a arbitraje incluya una autorización al árbitro para imponer daños y perjuicios por prácticas lesivas al reconocimiento de la unión, remedio que no alcanzó expresión en el texto del convenio y cuya trascendencia es tal que de haberse considerado no podía escapar la negociación y su final acceso al texto escrito del convenio colectivo. "Como censor del convenio, la encomienda del árbitro es ejecutar la intención de las partes.[4] Su fuente de autoridad es el acuerdo obtenido en la contratación colectiva y él deberá interpretar y aplicar ese acuerdo a tenor de 'el derecho industrial común del taller' y de las variadas necesidades y deseos de las partes. El árbitro, sin embargo, no tiene facultad general para invocar leyes en conflicto con el convenio entre las partes." Cuando se da encomienda a un árbitro para interpretar y aplicar lo acordado en el convenio colectivo, él debe poner a contribución su juicio informado para lograr una solución justa del conflicto. Esto es particularmente cierto cuando se trata de formular remedios. En tal caso lo que se necesita es flexibilidad para encarar una amplia variedad de situaciones. Puede que los que escribieron el convenio nunca pensaron en qué remedio específico debía proveerse para una particular contingencia. No obstante "el árbitro está limitado a la interpretación y aplicación del convenio colectivo; él no se sienta a dispensar su

---

(4) La concepción correcta de la función del árbitro es básica. Él no es un tribunal público impuesto a las partes por autoridad superior que aquéllas vengan obligadas a acatar. El árbitro *no tiene una comisión general para administrar justicia* para una comunidad que trasciende las partes. El es mejor visto, parte de un sistema de gobierno propio creado por y limitado a las partes. Le sirve a la exclusiva voluntad de ellas, para administrar el régimen de derecho establecido por su convenio colectivo. Shulman, *Reason, Contract and Law in Labor Relations,* 68 Harv. L. Rev. 999, 1016 (1955).

propia marca de justicia industrial. Puede naturalmente buscar orientación en muchas fuentes, pero su laudo será legítimo sólo hasta donde tome su esencia del convenio colectivo. Cuando la palabra del árbitro sea de manifiesta deslealtad a esta obligación, las cortes no tienen otra alternativa que negarse a poner en vigor el laudo." (*United Steelworkers of America* v. *Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). *Alexander* v. *Gardner Denver Company*, 415 U.S. 36, 53 (1974).

Al originar como remedio por la violación del contrato la condena del patrono a una fuerte indemnización, el árbitro se salió del campo del convenio en busca de legislación o recurso como el de daños punitivos que en Puerto Rico no hemos aceptado. *Vda. de Megwinoff* v. *Méndez*, 62 D.P.R. 415 (1943). Si un laudo arbitral descansa "exclusivamente en el punto de vista del árbitro en cuanto a requisitos de legislación vigente, en vez de la interpretación del convenio producto de negociación colectiva, el árbitro habrá excedido el ámbito de sumisión", y el laudo no será puesto en vigor. *Ibid.*, Steelworkers. En consecuencia, el árbitro tiene autoridad para resolver únicamente cuestiones de derechos contractuales, y así queda limitada su facultad, no importa que ciertos derechos contractuales son similares a, o duplican, derechos substantivos.

El procedimiento de arbitraje, si bien apropiado para la decisión de controversias contractuales, es un foro inadecuado para la adjudicación final de derechos constitucionales o estatutarios. . . . Hay elementos en el proceso arbitral que lo hacen comparativamente inferior al proceso judicial en la protección de derechos estatutarios. Entre éstos se encuentra el hecho de que la competencia especializada de los árbitros se circunscribe preferentemente a la ley del taller, y no a la ley de la tierra.([5]) Las partes escogen un árbitro porque con-

---

([5]) Esta aseveración no implica en modo alguno, negación del alto grado de idoneidad y competencia de los árbitros en el rol vital de implementación de la política pública que favorece el arbitraje de conflictos laborales.

fían en su conocimiento y buen juicio en cuanto concierne a las exigencias y normas de las relaciones industriales. Por otro lado, la decisión de cuestiones estatutarias o constitucionales es responsabilidad primaria de los tribunales. . . . El método para determinación de hechos en arbitraje por lo general no equivale al seguido en el foro judicial; no hay un récord tan completo, no se aplican reglas de evidencia; y los procedimientos comunes del juicio plenario como descubrimiento de pruebas, citaciones y alegaciones compulsorias, contrainterrogatorio y examen bajo juramento o están muy limitados o inasequibles de un todo. *Bernhardt* v. *Polygraphic Co.*, 350 U.S. 198, 203 (1956). El arbitraje es tan hermético y contenido dentro de su ámbito que el árbitro no viene obligado con el tribunal a dar las razones de su laudo. (⁶) *Bernhardt*, supra; *United Steelworkers of America* v. *Enterprise Wheel & Car Corp.*, supra, a la pág. 598.

La relativa facultad del árbitro para buscar remedios e imponer sanciones, aun cuando no previstos en el convenio, fue excedida al punto en que impuso "su propia marca de justicia industrial." El mismo admite que esta es la primera vez que un laudo arbitral impone tal remedio en nuestra jurisdicción. (Laudo Preliminar, pág. 14.) Su admisión abona un criterio respetable a la inexistencia de tal remedio en el "derecho industrial común" de Puerto Rico, (⁷) y des-

---

(⁶) Una alternativa que debe desalentarse porque un laudo bien fundado propicia la confianza en la integridad del proceso y ayuda en la clarificación del convenio colectivo.

(⁷) Se disuelve más aún toda razón para inaugurar remedios extraños a nuestro medio laboral ante la realidad inescapable de que la demandante es una unión repudiada por sus afiliados. (Laudo Preliminar, págs. 13–14) ; y de que existen otros remedios apropiados, como lo reconoce el árbitro al expresar:

". . . One remedy which would clearly be appropriate is a cease and desist order, enjoining the Company and its agents from continuing to discourage membership in the Union. It is the traditional solution used both by the NLRB and by the Puerto Rico Labor Relations Board to remedy unfair labor practices. It is also specifically authorized by Section XXII of the Agreement: 'the award of the Arbitrator may contain provisions directing or restraining acts and conduct of the parties.' "

taca en alto relieve la substitución de éste por "su propia marca de justicia industrial." Nuestro sistema de contratación colectiva del que forma parte el arbitraje compulsorio ha servido bien a la paz industrial. En este momento de desempleo endémico, de agotamiento de incentivos y de decadencia de la capacidad competitiva de nuestra industria al punto en que hay períodos en que el cierre de fábricas se traduce en mayor número de empleos perdidos que los fomentados, es poco menos que absurdo e incompatible con la política pública de fomento industrial, [8] la adición a los existentes mecanismos remediales de facultad y discreción en el árbitro para conceder compensación por daños y perjuicios a las uniones. Es como añadir lastre al bote que ya zozobra bajo el peso de sus tripulantes. Tiene hoy aumentada validez la admonición de *Beaunit of Puerto Rico* v. *J.R.T.*, 93 D.P.R. 509, 520 (1966): "También conviene tener presente, porque parece que se olvida, que las uniones no son las beneficiarias de los convenios colectivos, sino que los beneficiarios son los obreros,

---

[8] La Ley de Relaciones del Trabajo de Puerto Rico (Núm. 130 de 8 de mayo de 1945—29 L.P.R.A. sec. 62 y ss.) contiene la siguiente declaración de política pública:

"Sec. 62—*Declaración de política pública*

"La política pública del Gobierno de Puerto Rico, en lo que respecta a las relaciones entre patronos y empleados y a la celebración de convenios colectivos, es la que a continuación se expresa:

"(1) Es necesidad fundamental del pueblo de Puerto Rico alcanzar el máximo desarrollo de su producción a fin de establecer los niveles más altos de vida posibles para su población en continuo crecimiento; es la obligación del Gobierno de Puerto Rico adoptar aquellas medidas que conduzcan al desarrollo máximo de esa producción y que eliminen la amenaza de que pueda sobrevenir el día en que por el crecimiento continuo de la población y la imposibilidad de mantener un aumento equivalente en la producción tenga el pueblo que confrontar una catástrofe irremediable; y es el propósito del gobierno desarrollar y mantener tal producción mediante la comprensión y educación de todos los elementos que integran el pueblo respecto a la necesidad fundamental de elevar la producción hasta su máximo, de distribuir esa producción tan equitativamente como sea posible; y es asimismo el propósito del gobierno desarrollar en la práctica el principio de la negociación colectiva, en tal forma que pueda resolverse el problema básico de la necesidad de una producción máxima."

en aquella medida en que los convenios les confieren beneficios de cualquier clase."

Ausente autorización específica en el convenio colectivo y no apareciendo que la condena al pago de cuantiosas sumas de daños y perjuicios fuera parte del "derecho industrial común" en el medio laboral en que opera la fábrica de la recurrente, ni representara intención o deseo de las partes, la decisión arbitral está viciada de extralimitación y falta de debido proceso. Cf. *Junta de Relaciones del Trabajo* v. *Otis Elevator Co.*, 105 D.P.R. 195 (1976).

Dictaría sentencia modificando la de instancia al efecto de eliminar del laudo impugnado las partidas de $10,000.00 por daños y $1,950.00 de costas; dejando en vigor sus demás disposiciones.

—O—

EN RECONSIDERACIÓN

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

San Juan, Puerto Rico, a 8 de marzo de 1978

■ Resolvemos la reconsideración formulada a nuestra opinión y sentencia[1] del 30 de noviembre de 1977 en la que se decidió que en un procedimiento de arbitraje obrero-patronal, el árbitro tiene facultad implícita para conceder un remedio en daños, aun cuando no se hubiese estipulado expresamente dicho poder en el acuerdo de sumisión ni en el convenio colectivo. Bajo la premisa de que se había desfilado prueba suficiente confirmamos la sentencia sumaria del Tribunal Superior desestimando la demanda presentada por la recurrente Sonic Knitting Industries, Inc., contra la International Ladies Garment Workers Union (ILGWU) sobre nulidad de un Laudo Arbitral sindical que ordenó el cese y

---

[1] El Juez Asociado Señor Díaz Cruz suscribió una opinión disidente, a la cual se unió el Juez Asociado Señor Martín.

desiste de determinadas acciones y reconoció a la unión compensación por daños en concepto de cuotas, contribuciones al plan de salud y bienestar, gastos del litigio y $10,000.00 por pérdida en la capacidad para negociar.

Hemos analizado los planteamientos de las partes en reconsideración, y los esbozados en la comparecencia de la Asociación de Industriales de Puerto Rico en su carácter de *amicus curiae.*

I

A los fines de una cabal comprensión de la decisión de hoy, examinemos nuevamente los hechos que dan génesis al caso. Sonic Knitting Industries, Inc., corporación doméstica que formaba parte del complejo de corporaciones denominado "Caribbean Leisurewear" dedicado a la industria de la aguja en Puerto Rico, suscribió un convenio colectivo con el sindicato International Ladies Garment Workers Union (ILGWU) el 28 de agosto de 1972 a vencer el 27 de agosto de 1975. Se estableció un procedimiento de arbitraje para dilucidar las controversias que surgieran entre las partes estableciéndose que el Laudo del Arbitro sería final y obligatorio siempre que fuera conforme a derecho, y en adición podría contener aquellos otros remedios que se estimaran apropiados. Como resultado de la crisis y dificultades económicas que encaraba la industria de la aguja en Puerto Rico, en el mes de noviembre de 1974 Sonic decidió relocalizar al Municipio de Morovis sus talleres de Hato Rey. A tenor con las disposiciones del convenio colectivo, el 15 de noviembre de 1974 notificó a la Unión tal decisión. Las partes negociaron el traslado acordándose satisfacer una compensación a aquellos empleados que no pudieran o no quisieran mudarse a Morovis, y pagar la suma de $175.00 a los que decidieran trasladarse. Unicamente tres (3) empleados optaron por mudarse, dos (2) de los cuales fueron ascendidos al cargo de supervisor. Seis (6) empleados permanecieron trabajando en Hato Rey en un local ocupado por "Caribbean Leisurewear"

realizando labores de imprimir y pegar etiquetas a los productos. A manera de paréntesis, consignamos que para sus tareas en Morovis, Sonic empleó desde el mes de enero hasta el 24 de julio de 1975, cuarenta y seis (46) personas la mayoría de las cuales habían trabajado sin afiliarse a ningún sindicato con "Morovis Texturing", una corporación hermana. Estos habían experimentado las fluctuaciones y cesantías de la situación económica crítica de la industria de la aguja. Durante sus períodos probatorios, Sonic les pagó un salario mayor al contemplado en el convenio y voluntariamente los cubrió con un plan médico idéntico al que tenían cuando se desempeñaban como empleados de "Morovis Texturing". En 3 de febrero de 1975 trece (13) de dichos empleados firmaron tarjetas autorizando a la Unión a actuar como su representante exclusivo. Con el tiempo, los empleados que finalizaron sus períodos de prueba rehusaron ingresar a la Unión y firmar dichas tarjetas. La Unión, aun cuando pudo bajo la cláusula de "taller cerrado" haber insistido en que firmaran o fueran cesanteados, optó por no hacer presión alguna por estimar que ello sería contraproducente.

Entre finales de enero y principios de febrero de 1975 los restantes empleados del taller de Hato Rey, de común acuerdo y concierto, decidieron que no querían continuar siendo representados por la Unión y visitaron al vice-presidente de la empresa, quien los refirió a su abogado, y éste a su vez les informó que no podía representarlos y les concertó telefónicamente una entrevista con un oficial de información y orientación de la Junta Nacional de Relaciones del Trabajo. Subsiguientemente, uno de ellos radicó ante dicho foro, a nombre propio y en representación de sus otros compañeros, una petición solicitando la desautorización de la cláusula de taller unionado incluida en el Convenio. Con posterioridad, cuatro (4) de ellos solicitaron y obtuvieron permiso del patrono para acudir, durante horas laborales y sin que se les descontara paga alguna, a la planta de Morovis a realizar campaña y ob-

tener firmas a favor de la petición de descertificación. En 20 de marzo de 1975, se celebró una elección en las facilidades de Hato Rey y en el taller de Morovis bajo los auspicios de la Junta Nacional en la cual 27 empleados votaron a favor de la desautorización solicitada, 6 empleados en contra y un (1) voto fue recusado. El sindicato objetó este resultado y en reconsideración la Junta Nacional anuló la elección y desestimó la petición de desautorización al encontrar probado que el patrono permitió indebidamente a algunos empleados de Hato Rey trasladarse en horas laborables—y sin descuento salarial alguno—al taller de Morovis con el objeto de solicitar firmas de los empleados en apoyo de la petición.

El sindicato solicitó el arbitraje de si las acciones del patrono antes reseñadas constituían una violación al Art. II del Convenio, que en lo pertinente disponía:

"Mediante la presente el Patrono reconoce a la Unión como el único y exclusivo agente negociador colectivo de todos los empleados cubiertos por este Convenio. Que el patrono ni ninguno de sus agentes, directa o indirectamente desalentará el que sus miembros pertenezcan a la Unión." (Traducción nuestra.)

A tal efecto se sometió a arbitraje lo siguiente:

"¿Violentó el Patrono el artículo II (Reconocimiento de la Unión) al incurrir en conducta que tuvo como propósito y efecto desalentar el pertenecer a la Unión?" (Traducción nuestra.)

Se celebraron vistas iniciales ante el árbitro Sr. David M. Helfeld, quien en Laudo Preliminar resolvió que Sonic incumplió el Convenio Colectivo por haber cometido actos que directa e indirectamente desalentaron a sus empleados pertenecer al Sindicato, y además determinó que la controversia sometídale le facultaba para fraguar un remedio en términos de la concesión de daños. Como remedio adecuado dispuso que Sonic colocara avisos en el sitio de trabajo y enviara a todos los empleados una carta indicando, en síntesis, que había incumplido con el Convenio Colectivo y que prometía no cometer violaciones adicionales. A su iniciativa, las partes

presentaron memorandos sobre la procedencia de los posibles daños y los criterios que deberían ser utilizados para la consecución de los mismos. Se celebró una vista adicional para recibir evidencia en la cual la Unión recurrida sometió dos (2) declaraciones juradas del Sr. Angel Díaz—agente local del sindicato—fechadas 20 de junio y 3 de julio de 1975, y atestó sobre varios extremos; además se recibió testimonio del señor Clifford W. Depin, Director Regional de la Unión. Este último expuso su criterio de que el sindicato eventualmente convencería a los empleados de que se afiliaran al mismo, y oportunamente las partes lograrían firmar un nuevo Convenio Colectivo.

El Laudo Final ordenó pagar a la Unión: (a) las cuotas de aquellos empleados que se negaron a firmar la tarjeta de descuento de cuotas desde el 3 de febrero hasta el 27 de agosto de 1975—fecha en que finalizó el Convenio; (b) las contribuciones al fondo de salud y bienestar del sindicato internacional recurrido, sin deducción alguna por los servicios no prestados a los empleados; (c) la suma de $1,950.00 en honorarios de abogado y gastos de sus consultores en materia laboral; y (d) satisfacer la cantidad de $10,000.00 en daños por alegadas pérdidas de la Unión, en su capacidad de representar efectivamente a los empleados de la compañía, pérdida en el poder de regateo (*bargaining power*), el *status* dudoso del sindicato como representante de los empleados para la negociación colectiva, y el costo, tiempo y energía que el sindicato tendría que invertir para resolver su *status* de representante de los empleados para la negociación colectiva.

Declarada sin lugar la demanda de nulidad del laudo radicada por Sonic, expedimos recurso de revisión.

## II

Por su relevancia es de rigor señalar que el árbitro en su Laudo Preliminar reconoció que durante la época en que se desarrollaron los hechos que motivaron la controversia,

existían una serie de factores—fuera del control de la empresa recurrente—que por sí solos tendían a desalentar la permanencia de sus empleados como miembros del sindicato, a saber: (a) la grave situación económica de la industria de la aguja en Puerto Rico y su consecuente efecto en la reducción de la fuerza obrera en dicha industria y en particular en las operaciones de Sonic; (b) el traslado de las operaciones de la empresa a Morovis, con la consecuencia de que todos los empleados de Hato Rey, con excepción de nueve (9), optaron por cesar en sus empleos y aceptar una compensación en lugar de mudarse a dicha municipalidad; (c) el sentimiento de inseguridad económica que causó tal acción entre los empleados de Hato Rey; (d) incremento de este sentimiento de inseguridad económica cuando los empleados se percataron que estaban trabajando en las facilidades de una compañía donde la mayoría de los trabajadores no estaban unionados ni representados por sindicatos; (e) ausencia de una tradición de lealtad hacia el sindicato que los representaba; (f) el hecho de que la mayoría de los empleados nuevos contratados por Sonic en Morovis habían trabajado anteriormente en otra corporación hermana de Sonic llamada "Morovis Texturing", sin afiliarse a ningún sindicato y habían también sufrido experiencias de alzas y bajas en el desempleo en la industria como resultado de la crítica situación económica vigente; (g) escepticismo de los empleados de Sonic hacia el sindicato internacional debido al inestable cuadro económico prevaleciente; y (h) la conclusión arbitral de que ante tales circunstancias, los empleados de Sonic pudieron por sí mismos haber decidido rechazar al sindicato internacional como su representante. (Págs. 7–8 Laudo Preliminar.)

También como cuestión de hecho concluyó que la Unión no había podido probar las siguientes alegaciones: (a) historial de hostilidad de parte de Sonic, determinando por el contrario que antes del traslado a Morovis las relaciones eran normales; (b) que la Compañía no notificó adecuadamente a

la Unión su decisión de trasladarse; (c) que después de la elección de descertificación el patrono concedió a sus empleados dos días y medio con paga, determinando que fue uno solo; (d) que la Compañía había prometido un aumento de 10¢ por hora si la Unión era derrotada; y (e) que los dos empleados unionados que se trasladaron a Morovis fueron ascendidos a supervisores por motivos anti-unión, deduciendo en contrario que mediaron razones válidas y legítimas para tales ascensos.

Para sostener su conclusión de que Sonic había violado el Convenio estimó probado los siguientes extremos: (a) que el vice-presidente de Sonic no debió referir a los empleados que deseaban desafiliarse de la Unión a su abogado; (b) que el abogado no debió concertarles una cita con el oficial de la Junta Nacional; (c) que la Compañía debió negar autorización y no pagarle salario por horas no trabajadas a los cuatro (4) que se trasladaron a la planta de Morovis para obtener firmas en apoyo de la petición de descertificación; (d) que la presencia de estos cuatro empleados en Morovis debió haber desanimado a los de allí sobre su ingreso en la Unión; (e) que la decisión de la empresa aumentando a los empleados probatorios a $1.90 la hora, tipo mayor al contemplado en el Convenio; y (f) que el haberles extendido cubierta bajo el plan médico de la Compañía contribuyó a desanimarlos.

El árbitro razonó que esta conducta desarrolló y propició una actitud de hostilidad hacia la Unión en un ambiente ya recargado de rechazo, influido por otros factores tales como la celebración de una fiesta con un día de asueto por el triunfo de las elecciones de descertificación en que participaron algunos empleados supervisores.

## III

Es a la luz de los hechos y señalamientos expuestos que debemos resolver la reconsideración. Primeramente, es menes-

ter dejar sentado que el Art. XXII del convenio dispone que "el laudo del árbitro *será final y obligatorio siempre que sea conforme a derecho [,y] en adición a conceder aquellos otros remedios que estime apropiado*, el laudo del árbitro podrá contener medidas instruyendo o restringiendo actos y conducta de las partes." En virtud de este lenguaje y de las autoridades citadas en la opinión original de este Tribunal, reiteramos en principio nuestra posición de que el árbitro estaba facultado a diseñar remedios compatibles con su fallo, y que su finalidad y obligatoriedad estaba condicionada a que estuviera a tono con el derecho vigente. Esta conclusión guarda correspondencia con nuestra política de favorecer el arbitraje—implementada mediante una abstención judicial— fundada en el principio de mínima interferencia en los procesos de negociación colectiva obrero patronal allí donde las partes han sustituido los tribunales por el árbitro, y es corolario de nuestros pronunciamientos en *Colón Molinary* v. *A.A.A.*, 103 D.P.R. 143, 160 (1975), de "trazar rumbos paralelos entre un laudo arbitral y un dictamen judicial", y el razonamiento y criterio anticipado en *U.T.I.E.R.* v. *J.R.T.*, 99 D.P.R. 512, 533 (1970), reconociendo la procedencia de ordenar compensación por daños por una huelga ilegal si se entiende "que ese remedio es necesario y apropiado para efectuar los propósitos de la ley." Ello no significa que en la mesa de negociaciones las partes no puedan contractualmente restringir parcial o totalmente este poder o proveer una medida de daños líquidos o computables mediante una fórmula, para evaluar posibles contingencias o limitarlas de algún modo. Los argumentos del *amicus curiae* sobre este particular fundados en los posibles abusos de una unión poderosa y los efectos negativos en el debilitado clima industrial prevaleciente en Puerto Rico, no nos convencen contra la sabiduría de la norma una vez se examine su balance a la luz de los pronunciamientos más adelante vertidos.

■ En segundo lugar, por su impacto en la solución

del caso, es pertinente aclarar el significado y contenido de la frase "conforme a derecho". El árbitro Sr. Helfeld concluyó que la frase se refería a las doctrinas relevantes y prevalecientes en el área del derecho laboral, en particular—tratándose de una industria sujeta a la jurisdicción federal—a los principios elaborados bajo la Sec. 301 de la Ley Taft-Hartley; en consecuencia sostuvo que significaba ". . . según la jurisprudencia del Tribunal Supremo. Específicamente, el laudo arbitral debe extraer 'su esencia del acuerdo del convenio colectivo', y puede 'buscar sus guías de muchas fuentes'. Esas fuentes incluyen decisiones relevantes de los Tribunales Supremos de Estados Unidos y Puerto Rico en el campo del derecho laboral, de cortes de primera instancia y decisiones de agencias administrativas en el nuevo [*sic*] campo, y los laudos y escritos de reputados árbitros." Si bien merece aprobación esta línea de pensamiento,(²) es menester consignar que nuestra doctrina jurisprudencial la contempla como una de las excepciones que permite a los tribunales intervenir para revisar la corrección y validez jurídica de un laudo. *S.I.U. de P.R.* v. *Otis Elevator Co.*, 105 D.P.R. 832 (1977); *Colón Molinary*, supra, y casos allí citados (155). En el caso rector de *Junta Relaciones del Trabajo* v. *N.Y. & P.R. S/S Co.*, 69 D.P.R. 782 (1949), indicamos que al cualificarse la finalidad y obligatoriedad de un laudo—como el que nos ocupa—a que sea "conforme a derecho", "el árbitro [no] tiene autoridad para hacer caso omiso de las reglas de derecho sustantivo" y por tanto puede ser anulado a causa de tales errores. (802.) Su función es análoga a la ejercida por una sala sentencia-

---

(²) Véanse: *Textile Workers* v. *Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912 (1957); *Teamsters Local* v. *Lucas Flour Co.*, 369 U.S. 95 (1962); *Atkinson* v. *Sinclair Refining Co.*, 82 S.Ct. 1318, 370 U.S. 238, 8 L.Ed.2d 462 (1962); *Goodyear Tire & Rubber Co., etc.* v. *Sanford*, 540 S.W.2d 478 (1976); *United Steelworkers* v. *Northwest Steel Rolling Mills, Inc.*, 324 F.2d 479 (1963); *Local 469 International Brotherhood of Teamsters* v. *Heff Oil and Chemical Corp.*, 226 F.Supp. 452 (1964); *Swift & Co.* v. *United Packinghouse Workers*, 177 F.Supp. 511 (1959); *Carey* v. *General Electric Co.*, 213 F.Supp. 276 (1962).

dora de primera instancia, estando el foro apelativo facultado para revisar los planteamientos al respecto. D. Fernández, *El Arbitraje Obrero Patronal en Puerto Rico*, XXXV Rev. Jur. U.P.R. 7, 17–18 (1966); Cancio H., *El Arbitraje Obrero Patronal en Puerto Rico*, II Inst. de Relaciones del Trabajo, Servicios Sociales, U.P.R. (1953).

■ En Puerto Rico, nuestras decisiones en materia de remedios pecuniarios en caso de violación a un convenio o bajo la ley laboral no reconocen ni favorecen la imposición de daños punitivos, salvo cuando la ley los establece o las partes los fijan claramente *a priori*. "Las penalidades no se presumen y su imposición se justifica solamente cuando la ley expresamente lo dispone"; *J.R.T.* v. *Ventanas Yagüez, Inc.*, 103 D.P.R. 933, 935 (1975) y casos allí citados; *Rivera* v. *Security Nat. Life Ins. Co.*, 106 D.P.R. 517 (1977).

Advertimos que en la jurisdicción federal los tribunales, en el desarrollo del derecho sustantivo(³) sobre poder remedial bajo la Sec. 301, se han dividido y no existe consenso unánime. La disposición de ley no contempla estos daños punitivos. El criterio judicial mayoritario es no reconocerlos y exigir que dicho poder se confiera al árbitro taxativamente en el convenio o en la sumisión. *College Hall Fashions* v. *Philadelphia, etc.*, 408 F.Supp. 722, 727 (1976); *International U. of Op. Eng. Local No. 450* v. *Mid-Valley Inc.*, 347 F.Supp. 1104, 1109 (1972); *Local 127, United Shoe Workers* v. *Brook Shoe Mfg. Co.*, 298 F.2d 277, 281–282 (3rd Cir. 1962). En *Sidney Wauyer & Sons, Inc.* v. *Milk Drivers Union*, 249 F.Supp. 664 (1966), se sostuvo dicho poder aunque subrayándose su carácter extraordinario como mecanismo de reserva para situaciones que no pueden ser remediadas de otro modo. Consúltese además *Hotel and Rest.*

---

(³) Otros casos en que se ha negado la concesión de daños punitivos si el Convenio Colectivo no concede ninguna facultad al árbitro: *Celenese Corp. of America*, 14 L.A. 35 (1950); *Eugene Rothmund, Inc.*, 17 L.A. 40 (1951); *A.C. & C. Co.*, 24 L.A. 538 (1955); *Diamond National Corporation*, 41 L.A. 1311 (1963); *Canadian Porcelain Co., Ltd.*, 41 L.A. 419 (1963).

*Emp., etc.* v. *Michelson's Food Serv.*, 545 F.2d 1248, 1253–1254 (9th Cir. 1976), en que el tribunal coincidió con la caracterización de "poco usual" del remedio pero no decidió el asunto. (⁴)

■ Distinto a lo expuesto, los tribunales federales, reconociendo la amplia latitud que poseen los árbitros para diseñar remedios apropiados, han sostenido dicha facultad en materia de daños compensatorios o monetarios por costas y gastos de arbitraje y otros conceptos. *College Hall Fashions*, supra, 728–729; *United Steelworkers of America* v. *United States Gypsum Co.*, 492 F.2d 713 (5th Cir. 1974); *Minute Maid Co.* v. *Citrus Workers, Local 444*, 331 F.2d 280, 281 (5th Cir. 1964); *Asbestos Workers* v. *Leona Lee Corp.*, 84 L.R.R.M. 2165, 2170–2172 (1973). Sin embargo, se rechazan daños cuando son de naturaleza especulativa. Véase: Elkouri & Elkouri, *How Arbitration Works*, págs. 351–354, Tercera Ed. (1976). Este autor se hace eco de los criterios de reputados árbitros en el sentido de que "la parte debe probar su reclamación por daños y de que negarán un remedio monetario cuando la existencia del daño sea demasiado especulativo." (353.) No se exige certeza matemática, sino una determinación basada en prueba razonable y sustancial. Coincidimos con este enfoque, previamente formulado en el caso de *U.T.I.E.R.*, supra, en que restringimos nuestro mandato a la Junta sujeto a una estipulación de daños por las partes o al recibo de la evidencia correspondiente. (533.)

## IV

■ Tomando como correctas las determinaciones fácticas del Laudo, al confrontar las actuaciones indebidas en que incurrió Sonic con los factores existentes ajenos y no contro-

---

(⁴) La actitud judicial prevaleciente de no sancionar laudos proveyendo compensación de naturaleza punitiva, guarda mayor correspondencia con nuestro estado de derecho vigente, por lo cual hemos de aplicarla a situaciones como la de autos.

lables por ésta—que *per se* desalentaban y creaban un clima contrario a la Unión debido a la inseguridad económica, ausencia de tradición de lealtad hacia la Unión y otros—queda cuestionado seriamente en derecho la validez y procedencia de las compensaciones. Las mismas no pueden sostenerse sin caer en el campo de la especulación, ya que el propio árbitro encontró probado que los nuevos empleados de la planta de Morovis en su mayoría habían experimentado las alzas y bajas de la industria de la aguja y habían trabajado previamente con otra entidad sin afiliarse. La partida de $10,000.00 en concepto de pérdida en su capacidad de representar y el poder de regateo y el costo, tiempo y energía para resolver su *status* de representante de la Sonic, resulta jurídicamente de naturaleza especulativa por varios fundamentos: (a) en la Unidad de Morovis, la Unión *nunca* disfrutó del respaldo de sus empleados; (b) los factores y condiciones allí presentes no atribuíbles al patrono sobrepasaban las acciones indebidas de éste y razonablemente apuntaban a un rechazo de la Unión; y (c) su imposición, como remedio excepcional no se justifica. Convalidarlo sería aceptar un remedio inapropiado de naturaleza punitiva. Es correcta la disposición del árbitro sobre el pago de las cuotas de los empleados que se negaron a firmar y el ordenar se satisficieran las cantidades al fondo de salud, sin deducción, en las circunstancias apuntadas. Respecto a gastos y honorarios de abogado, habida cuenta de la procedencia de la notificación escrita de cese y desiste como único remedio apropiado—no impugnado por la recurrente Sonic—y las complejidades del trámite arbitral, sostenemos su imposición en el ejercicio discrecional de la autoridad del árbitro.([5]) *Steelworkers* v. *Butler Mfg. Co.*, 439 F.2d 1110, 1112 (1971); *Colón Molinary*, supra, 159–160.

---

([5]) Se ha considerado que la imposición de las costas y gastos del procedimiento de arbitraje es una sanción remedial apropiada para situaciones como la del caso de autos. Wolf, Sidney A., *The Power of the Arbitrator to Make Monetary Awards*, Labor Arbitration—Perspectives & Problems, 176–193 (BNA Incorporated, 1964).

*Por los fundamentos expuestos, se dictará Sentencia en reconsideración revocando la del Tribunal Superior, Sala de San Juan del 15 de noviembre de 1976, y en su lugar se dictará Sentencia Sumaria limitando la virtualidad del Laudo Final a los remedios de la orden escrita de cese y desiste, al pago de las cuotas y cantidades al fondo de salud de la Unión hasta el 2 de agosto de 1975, y al pago de la suma de $1,950.00 en concepto de honorarios de abogado.*

El Juez Presidente Señor Trías Monge concurre en el resultado en cuanto a la confirmación del Laudo, sin embargo disiente de la alteración del monto de los daños. El Juez Asociado Señor Rigau no intervino.